# SUPREME JUDICIAL COURT

#### FOR THE

## COUNTY OF SUFFOLK, NOVEMBER TERM 1854, AT BOSTON.

---

### PRESENT:

HON. LEMUEL SHAW, CHIEF JUSTICE.
HON. CHARLES A. DEWEY,
HON. THERON METCALF, } JUSTICES.
HON. GEORGE T. BIGELOW,

---

THE ATTORNEY GENERAL vs. THE PROPRIETORS OF THE MEET-
ING-HOUSE IN FEDERAL STREET IN THE TOWN OF BOSTON.

In 1727, L. purchased land in Boston of D. for five hundred and fifty pounds. In April 1735, certain arbitrators, to whom the differences, between L. of the one part, and G. and eight others of the other part, had been submitted, made an award, by which they directed that said G. and others pay to L. one hundred and forty pounds, "in full of the claims and demands which L. had against the congregation belonging to the Presbyterian Meeting-house in Long Lane in Boston, with respect to his attendance upon and looking after the building of the said meeting-house, and all his accounts of charges and disbursements about the same, and the land whereon it stands, as also touching and concerning L.'s purchase of the said land of D.;" and that L. execute "unto the said congregation a good lawful deed of conveyance of the land whereon the said meeting-house stands and is thereunto appertaining, to hold the same unto the said congregation according to the tenures and after the same manner as the Church of Scotland hold and enjoy the lands whereon their meeting-houses are erected;" and ascertained "the right and

Attorney General *v.* Proprietors of the Meeting-house in Federal Street in Boston.

interest which L. hath in the said meeting-house to be the pew and seat therein, now in his possession, which is to remain good to him forever, in the same manner as the rest of the proprietors in the said meeting do hold and enjoy their respective rights and interests therein;" and awarded that L. transfer to said G. and others, "as they are a committee chosen and appointed by the said congregation for managing the prudential affairs thereof, the outstanding debts due to the said congregation." In June 1735 L., in consideration of one hundred and forty pounds to him paid by G. and three of the others named in the award, "in behalf of themselves, and as a committee chosen as aforesaid," conveyed the land to said G. and others, without words of inheritance, (reserving to L., his heirs and assigns, his right and interest in the pew as ascertained by the award,) to have and to hold the said land and meeting-house (reserving as aforesaid) unto the said G. and others, "in their capacity aforesaid, and to their successors in that trust and office forever, but to and for the only proper use, benefit and behoof of the said congregation (according to the tenures and after the same manner as the Church of Scotland hold and enjoy the lands whereon the meeting-houses are erected) forever, and for no other use, intent or purpose whatsoever." *Held*, that this deed vested the legal estate in fee in the grantees, in trust for the congregation, consisting of persons who had united together and agreed to form a religious society, and had contributed or bound themselves to contribute towards the cost of buildings and the support of public worship, and including proprietors of pews in the meeting-house; and that it did not create a pub lic charity for maintaining a Presbyterian church after the manner of the Church of Scotland.

*It seems,* that a trust, not a public charity, created by deed, for the benefit of a congrega tion, for maintaining a particular form of faith and worship, may be put an end to by the unanimous vote of the congregation and of the trustees to change their faith and form of worship.

*It seems,* that where a religious society, whose meeting-house is held in trust by their prudential committee, for maintaining a particular form of worship, vote to adopt, and do openly adopt another form of worship, their possession becomes adverse, and, if contin ued for a sufficient length of time, will bar a suit in equity to enforce the trust.

Possession for forty years by a religious society, under an act incorporating them as a con gregational society, of a meeting-house previously conveyed to their prudential com mittee in trust for the support of presbyterianism, will bar a suit in equity to enforce the trust.

INFORMATION, filed by the attorney general, on the 15th of November 1852, at the relation of the Associate Reformed Presbyterian Synod of New York, the First Associate Reformed Presbyterian Church and Society of Boston, the Reverend Alexander Blaikie, pastor of said church and society, their ruling elders and prudential committee, in behalf of themselves and the rest of the members of said church and society, and John W. Emery.

The information set forth that, on the 14th of May 1729, Henry Deering, by deed duly executed and recorded, conveyed to John Little, in fee, in consideration of £550, a parcel of land (bounded and described) situated on the corner of Long Lane

(now Federal Street) and Bury (now Channing) Street, in Boston ; that Little, being minded and disposed to devote his property to the founding and supporting of a church and place of religious worship, to be held and enjoyed forever for the preaching and maintaining of the doctrine, discipline, worship and form of government of the church known as the Presbyterian Church of Scotland, and to create and found a trust and charity therefor, did, on the 9th of June 1735, by indenture duly executed and recorded, in consideration of £140, 5*d.*, convey with warranty said land, particularly describing the same, together with the meeting-house then standing thereon, to George Glen, William Hall, William Shaw and Andrew Knox, " for themselves, and as a committee chosen and appointed by the rest of the congregation belonging to the Presbyterian Meeting-house in Long Lane in Boston aforesaid, for managing the prudential affairs thereof," saving and reserving to the said John Little, his heirs and assigns forever, his right, title and interest in and to a certain pew and seat in said meeting-house ; and in the limitations, conditions and establishing of the said trust, by the same deed, the said John Little did further recite and declare that the said land and meeting-house, with the appurtenances thereto belonging, saving and reserving as aforesaid, were to be held and enjoyed by the said George Glen, William Hall, William Shaw, and Andrew Knox, " in their capacity aforesaid, and by their successors in that trust and office forever ; but to and for the only proper use, benefit and behoof of the said congregation (according to the tenure and after the same manner as the Church of Scotland holds and enjoys the lands whereon the meeting-houses are erected) forever, and for no other use, intent or purpose whatsoever," as more fully appearing by the deed, a copy of which was annexed to the information, and is set forth in the margin.[*]

---

[*] This Indenture, made the ninth day of June, Anno Domini one thousand seven hundred and thirty five, and in the eighth year of the reign of our Sovereign Lord George the Second, by the grace of God, of Great Britain, France and Ireland, King, Defender of the Faith, &c., between John Little, of Boston, in the county of Suffolk and Province of the Massachusetts Bay, in New England, gardener, on the one part, and George Glen, tailor, William Hall, leather

The information then alleged that the said Little, and the said Glen, Hall, Shaw and Knox, together with certain others, then living in Boston, being Presbyterians, and strongly attached to the doctrine, discipline and worship of the church known as the Presbyterian Church of Scotland, being minded and disposed to devote their property to the founding and supporting of a church and place of religious worship, to be held and enjoyed forever,

dresser, and William Shaw, tailor, all of Boston, aforesaid, and Andrew Knox, of said Boston, mariner, for themselves, and as a committee chosen and appointed by the rest of the congregation belonging to the Presbyterian Meeting-house in Lcng Lane, in Boston aforesaid, for managing the prudential affairs thereof, on the other part, witnesseth : That the said John Little, for and in consideration of the sum of one hundred and forty pounds and five pence, in good public bills of credit of the province aforesaid to him in hand, at and before the ensealing and delivery of these presents, well and truly paid by the said George Glen, William Hall, William Shaw and Andrew Knox, in behalf of themselves, and as a committee chosen as aforesaid, the receipt whereof the said John Little doth hereby acknowledge, and thereof doth acquit and discharge the said George Glen, William Hall, William Shaw and Andrew Knox, in behalf of themselves, and in their capacity aforesaid, and their successors in said trust, and each and every of them forever, by these presents, hath given, granted, bargained, sold, aliened, enfeoffed, released, conveyed and confirmed, and by these presents doth give, grant, bargain, sell, alien, enfeoff, release, convey, and confirm unto the said George Glen, William Hall, William Shaw and Andrew Knox, a certain piece or parcel of land, situate, lying and being in Boston aforesaid, and is bounded in the front westerly upon Long Lane, so called, there measures one hundred and twenty nine feet; northerly by land of Mr. Jonathan Loring, and there measures ninety eight feet; easterly by land of Nathaniel Green, Esq., and there measures one hundred and fifteen feet; southerly by Bury Street, so called, and there measures one hundred and twenty six feet and an half foot; or however otherwise butted and bounded, or be the dimensions on either side more or less; also the meeting-house on the said land standing; together with all and singular the rights, members, profits, privileges, fences, improvements and appurtenances whatsoever to the said granted and bargained piece or parcel of land and meeting-house belonging, or in any wise appertaining, or therewith now used, occupied or enjoyed; also all the estate, right, title, interest, inheritance, use, possession, property, claim and demand whatsoever of him the said John Little, of, in and to the said granted and bargained premises, and every part and parcel thereof, with the appurtenances, and the reversion and reversions, remainder and remainders thereof; saving and always reserving to the said John Little, his heirs and assigns forever, the right and interest which the said John Little hath in the said meeting

for the preaching and maintaining of the said doctrine, discipline and worship, and to create and found a trust and charity therefor, did severally contribute, Little the land in said deed mentioned, in whole or in part, and the said Glen and others moneys wherewith the said meeting-house was built and the expenses attending the premises were defrayed; and did thereafter by the said indenture create and establish the said trust and charity.

house and land, to wit, the pew and seat therein now in his possession, which is to remain good to him, his heirs and assigns forever, in the same manner as the rest of the proprietors in the said meeting-house do hold and enjoy their respective rights and interests therein, which right and interest, by a certain instrument of award made by Jacob Sheafe, gentleman, and Stephen Boutineau and Hugh Vans, merchants, all of Boston aforesaid, between the said John Little on the one part, and the said George Glen, William Hall, William Shaw and others, a committee chosen for the purposes aforesaid, on the other part, bearing date the ninth day of April, one thousand seven hundred and thirty five, was ascertained to the said John Little, as by the said award, reference thereto being had, may more at large appear.

To have and to hold the said piece or parcel of land, meeting-house and premises, with the appurtenances, (saving and reserving as aforesaid,) unto the said George Glen, William Shaw, and William Hall and Andrew Knox, in their capacity aforesaid, and to their successors in that trust and office forever, but to and for the only proper use, benefit and behoof of the said congregation (according to the tenures and after the same manner as the Church of Scotland hold and enjoy the lands whereon the meeting-houses are erected) forever, and for no other use, intent or purpose whatsoever; with warranty against him the said John Little, and his heirs, and all and every other person and persons whatsoever, from, by or under him or them, together with the benefit of a warranty in a certain deed mentioned from Theodore Atkinson, gentleman, as the aforenamed Nathaniel Green purchased the same, as in and by the said deed, bearing date the twentieth day of November 1723, of record in the registry of deeds for the county of Suffolk, may appear; which granted land and premises, with the appurtenances before the said meeting-house was thereon erected, the said John Little purchased of Henry Deering, Esq.

In witness whereof, I the said John Little, and Mary his wife, (in token of her free consent to these presents, and release of her right and title of dower and thirds of, in and unto the aforegranted and bargained premises, with the appurtenances,) have hereunto set their hands and seals the day and year first aforewritten.　　　　　　　　　　　　　　　　John ⋈ Little, his mark, (Seal.)

Signed, sealed and delivered ⎫　　　Mary Little,　　　　　(Seal.)
　　　in presence of　　　　　⎬
　Willlam Morto, John Sale　⎭

It also alleged that this deed, with the said limitations and conditions, and with the trust so created and established, was accepted by the said Glen and others, and the premises held by them, in trust, according to the terms of the same ; and that the deed, so made and accepted, created a trust or charitable estate, of a very high character, to wit, for the support, encouragement, advancement and perpetuity of the Christian Religion, according to a certain and particular form of worship, government and discipline, and belief, known as Scotch Presbyterian ; which said trust or charitable estate the said Little, and the said Little, Glen and others, had good right to create and establish, and the said Glen and others had good right to accept, and did accept ; and that the said meeting-house and land were conveyed as aforesaid, with the express understanding that they were always to be held and enjoyed by the said Glen and others, and by their successors in office, forever, for the sole use and benefit of the congregation in said deed mentioned, which was a Presbyterian congregation, or for the use of a Scottish Presbyterian society or congregation, the successor or successors of the then society ; and that the limitations and conditions of the said deed expressly restrict the use, occupation and enjoyment of the said premises to a Presbyterian Trinitarian society, and none other, and prohibit the same to the use and enjoyment of any other society, and more especially that of a Congregational Unitarian society.

The information further alleged that the tenure by which the Church of Scotland held and enjoyed the lands whereon the meeting-houses were erected, in the year 1735, was a strict tenure, by which, whenever a society, parish or congregation of the said church ceased to be Scottish Presbyterian in any respect, either in profession of faith, form of worship, or government and discipline, then the said congregation, parish or society, by the mere fact of the case, ceased to hold and enjoy the lands on which the meeting-house was erected, and the same thereby passed as a matter of course into the jurisdiction and possession, and under the control of the General Assembly of the Church of Scotland, or of the proper authorities acting under it, to be used and enjoyed by another Scottish Presbyterian society, congrega-

tion or parish, that might wish to occupy the premises, and by none other; and that no Unitarian congregation or society could hold lands under the Church of Scotland; nor could any Scottish Presbyterian society, nor any society formerly belonging to the Church of Scotland, subsequently becoming a Unitarian society, hold or enjoy the lands, formerly held and enjoyed by it as a Church of Scotland, or as one of the churches or congregations of the Church of Scotland.

The information then set forth that the Church of Scotland, in 1735, was a Presbyterian church, of Presbyterian form, faith, government and discipline, and not a Congregational church; that it was a Calvinistic Trinitarian church, and in no respect a Unitarian Church, but was in matter of form, faith, government and discipline, in very many and most material matters, directly opposed to the forms, faith, government and discipline of what is known and called a Unitarian church or society, and more especially to the forms, faith, government and discipline of the Unitarian Church or society now occupying the premises mentioned in this information and bill.

It then set forth the doctrines and standards of the Church of Scotland; that said Little, Glen and others professed said doctrines, and were not Congregationalists, nor Unitarians, but Scottish Presbyterians; that there is a great difference therein; that one of the distinguishing features of the worship of that church is the use of a particular version of the psalms, known as Rouse's Version; that the society in Long Lane, from the time of its foundation, about 1730, until 1786, was a church after the form and pattern of the Church of Scotland, and precisely like that church in all matters of religious faith, worship, government and discipline, so far as the same were adapted to the civil government under which the society was placed, and used said version of the psalms; that the Associate Reformed Presbyterian Church of North America, is, in all material matters, the same as the Ancient Church of Scotland as it existed in the year 1735; that said association was made in or about the year 1782, and comprises a large majority of the churches in this country, professing the faith of the Church of Scotland, as it

does now, and has always existed, and corresponds identically with the said Church of Scotland, as it existed in the year 1735, in all matters of form, faith, government, worship and discipline, except as altered by the republican nature of our institutions.

The information then set forth that the congregation mentioned in the said deed of John Little was established about 1727, under the pastoral care of the Reverend John Morehead, a Presbyterian minister, of the school known as the Scotch Presbyterian, and previously a member of some presbytery in Scotland, and continued to flourish under his care as a Scotch Presbyterian society, after the manner of the Church of Scotland, until 1773, when he deceased; that thereafter, for about ten years, they were without a pastor, except for occasional services; that in 1783 the Reverend Robert Annan, a Presbyterian minister, of the faith of the Church of Scotland, a member of the Presbytery of New York, and subordinate to the Associate Reformed Synod of New York, was duly installed as their pastor, and so continued until 1786, when he removed from this commonwealth; that in 1745 a presbytery was established by the said Morehead and others, consisting of twelve congregations, and called the Presbytery of Boston, to which the said society belonged, and continued to belong, until 1774, when the said society notified a temporary declinature therefrom, for a special and temporary purpose, as by the doctrine, discipline and government of the Scottish Presbyterian church they had a right to do, and which wrought no change in the trust and charity aforesaid, that these congregations subsequently formed themselves into three presbyteries, and about 1776 were all joined in one body, called the Synod of New England, which continued to exist until 1782, when it was dissolved, and the Church and Society in Long Lane then became connected with the Presbytery and Synod of New York, with which it ever afterwards continued to be associated; that all these changes and memberships with different presbyteries and synods, did in nowise alter, or in any way affect the relations of the Church or Society in Long Lane, in matters of faith, government, worship or discipline, with the Church of Scotland, or the Associate Reformed Presbyterian

Church of this country, but were merely changes of convenience or necessity in matters of discipline.

The information then alleged that Annan was duly and legally called from the said Presbytery of New York, to the pastoral charge of the society in Long Lane, by their vote and request; and that measures were taken between said society, said presbytery, and Annan, by which the relation of dependence and control was recognized, and Annan was by said presbytery duly installed in 1783; and removed by them in 1786, at his own request; and that said Presbytery and Synod of New York have never relinquished or discharged their claim or right to control, govern and direct the church and society in Long Lane, but continue to this day to claim such right.

It then alleged that the society and church, here present as relators, known as the First Associate Reformed Presbyterian Church and Society of Boston, was duly organized by the Presbytery of New York, as a religious society, after the Presbyterian order, in 1846, as connected with, and under the jurisdiction of the said Presbytery and Synod of New York, a religious body, duly established, having full supervisory power in ecclesiastical matters over all the churches connected with it, and especially over the church and society here present as relators. That the Reverend Alexander Blaikie, here present as a relator, is minister of the said Presbyterian church and society of Boston, and is, and for many years before 1846, was a member of the Synod of New York, and was duly installed in his said ministry by the said Presbytery of New York; that this church and society have always professed and taught the same faith and conformed to the same discipline as did the said society in Long Lane, mentioned in the deed of John Little, according to the standards and constitution of the Church of Scotland in 1735, excepting as they are necessarily modified, to conform to the civil government under which said church and society is placed.

The information then set forth that in 1786 a majority of the congregation belonging to the church in Long Lane, contrary to the intentions of Little, and of said Little, Glen, and others, as expressed in his deed aforesaid, and contrary to the said deed, and

contrary to the trust and charity aforesaid, and contrary to right, resolved themselves into a society different from a Presbyterian society; and have ever since continued, with various changes of form of worship, faith, government and discipline, to be a society other than a Scottish Presbyterian society; that a minority of the congregation objected to the change at the time, and desired to remain under the ancient form of Presbyterian worship, government and belief, but was overborne, and obliged to submit to the wrong and injury done by the majority; whereupon the said trust was wholly perverted, abused and misapplied.

The information then alleged that in 1787 the Reverend Jeremy Belknap, an Orthodox Congregational minister, and not a Presbyterian minister after the order of the Church of Scotland, nor a member of any presbytery of North America, was installed over the said church and society as minister and pastor, by the Orthodox or Congregational form of installation, and not by the Presbyterian form; and that the Presbytery of New York did, with the minority of the said congregation, object to this installation, and to the action of the majority, and did not consent thereto; that said Belknap and said society made great changes in the forms of worship, rules of discipline, and opinions of belief, and introduced a new version of psalms and hymns; and the said meeting-house and lands continued, from 1786 to 1815, to be occupied, contrary to the intention of Little, and of Little, Glen and others, and contrary to the said deed, and to the trust and charity aforesaid, and contrary to right, by a society professing to be an Orthodox and Trinitarian Congregational society as aforesaid.

It further alleged that in 1815 the said congregation again changed its form of faith and discipline, and became, and has ever since continued to be a Unitarian society or congregation; and by this last change, the said trust became and was wholly perverted and abused, and misapplied, in that the Presbyterian discipline and worship of the Church of Scotland was wholly overturned, and another discipline and worship substituted in its stead; and the distinguishing forms of faith of the Presbyterian Church were wholly abrogated and denied, and other

doctrines, hostile to those, publicly taught in the pulpit of said church, and believed and professed by the said congregation; that in 1735 Unitarianism was not known, and could not by law exist, in Great Britain, Scotland, or the Colonies of Great Britain: and that the meeting-house and lands, in said deed of John Little mentioned, are not now held and enjoyed by the same tenure, as that by which the Church of Scotland held and enjoyed the lands whereon its meeting-houses were erected in the year 1735.

The information further alleged that John W. Emery, one of the relators, is a pewholder of the said church, now in the possession of these defendants, and is desirous that the said land and church should be given up, and the occupation be decreed to belong to the First Associate Reformed Presbyterian Church and Society of Boston.

It then alleged that the premises conveyed are those known as the meeting-house formerly called Dr. Channing's church, and now occupied by the Unitarian society, worshipping under the pastoral care of the Reverend Ezra S. Gannett, D. D., with the lands now in the occupation and possession of the said society, which society was duly incorporated in 1805; ( *St.* 1805, *c.* 19 ;) and that possession was formally demanded in 1849, and refused.

The information then alleged that the equity of this bill was in no manner weakened or impaired by reason of the lapse of time, or for any delay in the making of the said demand for the said premises; because no plea of time or of the statute of limitations can be made as a defence to the perversion or abuse of a charity or trust, on a bill of this nature; because these relators have never done any solemn or public act by which they recognized the right of these defendants, or of any one to use or enjoy the premises here sought to be recovered; because, the First Associate Reformed Presbyterian church and society have had no existence in this commonwealth until since the year 1846, and were not advised of their rights in the premises until a few months previous to the making of the said demand above mentioned; because the said minority who were opposed to the change made by the said congregation in the year 1786 were a

feeble company, unable to strive with the said majority; and because the said change first made by the said majority in the year 1786 was a change in discipline and form of worship, and not a material change in doctrine, for which reason the said minority were less urgently and immediately moved and incited to take active measures for redress of the breach of trust, and the perversion of the charity herein complained of; but that the change in 1815 by which the society became a Unitarian society, was a very material one, both in discipline, forms of worship, and opinions of belief, and was a change never contemplated by the said minority or by the majority in the year 1786, and would not have been permitted by the said minority, or the said majority, had it been attempted to be made while they had the power to resist it, and was made after the said minority and the said majority, or the most of them, were deceased; and that the jurisdiction of this court in matters of trusts and charities has not been, until within a few years past, sufficient for the full and proper consideration of matters of this nature.

And the information alleged that the premises were of great value; and prayed for a discovery, for an establishment and carrying into effect of the trust, for an account of the rents and profits received by the respondents, for a removal of the respondents, an appointment of new trustees, and a delivery to them of all deeds and papers relating to the trust, and for further relief.

The respondents, in their answer, upon the oaths of their prudential committee, say that they were made into a corporation by an act of the legislature passed on the 15th of June 1805, and are the true and sole owners of the premises demanded in the bill, and that this act was passed on the application of persons who, prior thereto, as owners of pews, were tenants in common of the land and house; that the charter was accepted, and they have ever since been in open, exclusive and undisputed possession, and have expended large sums of money in improvements, and especially in the erection of a new building for public worship; and submit that this possession for nearly fifty years should operate by way of confirmation and assurance to their title, even if originally defective, which they deny; and they rely upon this

Attorney General *v.* Proprietors of the Meeting house in Federal Street in Boston.

possession, and upon the statutes limiting actions, by way of bar, as if specially pleaded.

They admit the deed from Deering to Little, for the nominal consideration mentioned; but say that the true consideration of the said deed is hereinafter set forth. They admit the deed from Little to Glen and others; but they deny that it was made by Little with the intention of creating, or that it did create a charitable estate for the support, encouragement, advancement and perpetuity of the Christian religion, according to the Scotch Presbyterian form, or that any charitable use was created thereby, or sprung therefrom, or that it was so accepted by the said Glen and others, or that it was in any sense a gift, or coupled with any immutable condition, or that it was the intention of Little to restrict the use and occupation of the premises to a congregation worshipping after the form, and governed by the discipline of the Scotch Presbyterian Church, and none other; or that he had any right to make any such restriction or limitation whatever.

And they say that Little was simply one of numerous associates who undertook to build, and did build for their common use and benefit, a meeting-house on the land in question, in the conducting of which matter, and the purchase of said land, Little was the common agent of all the associates; that in the course of time a controversy arose between the said parties composing the said congregation on the one hand, and Little, as their agent, on the other, and was referred to three arbitrators, who under date of April 9th 1735 made their award, a copy of which was annexed to the answer, and is set forth in the margin; * and that

* To all people unto whom this present writing of award shall come, Jacob Sheafe, gentleman, Stephen Boutineau and Hugh Vans, merchants, all of Boston, in the county of Suffolk, and Province of the Massachusetts Bay in New England, send greeting:

Whereas, upon sundry disputes and differences arisen between John Little, of Boston aforesaid, gardener, on the one part, and George Glen, tailor, Edward Allen, tailor, Andrew Knox, mariner, George Southerland, shopkeeper, William Hall, leatherdresser, Daniel Macneal, laborer, Samuel Miller, gunsmith, Abraham All, tailor, and William Shaw, tailor, all of Boston aforesaid, of the other part,

Little made the deed to Glen and others in pursuance of this award; and that, in the said enterprise, Little devoted no part

they the said parties, for the determination thereof, and by their mutual consents signified by their several obligations, dated the fourteenth day of January, Anno Domini 1734, appoint us, the said Jacob Sheafe and Stephen Boutineau, arbitrators of all their differences till that time, and agreed that either of us, in case of our non-agreement, should choose a third person; and we being willing and desirous to determine the disputes and differences between said parties, in order to effect the same have chosen the said Hugh Vans to assist us therein; and the said parties by the said obligations further agree, that we, making up our award of the same under our hands and seals, ready to be delivered to the said parties, on or before the fifteenth day of April current, should finally determine the premises, as by their several obligations, with conditions for the performance thereof, will more fully appear. Now in pursuance of the said submission, and to answer the end proposed thereby, we the said Jacob Sheafe, Stephen Boutineau and Hugh Vans accept of the burthen of the said award, and having fully heard both parties, perused, examined and deliberately considered on all papers, matters and things disclosed or pretended to us by either party as the cause of their variance, do make, publish and declare this our award between them concerning the premises, in manner following, that is to say:

*Imprimis.* We award and order that the said George Glen, Edward Allen, Andrew Knox, George Southerland, William Hall, Daniel Macneal, Samuel Miller, Abraham All and William Shaw shall, within the space of two months from the date hereof, pay or cause to be paid unto the said John Little the sum of one hundred and forty pounds and five pence, in public bills of credit, which is and shall be in full of the claims and demands which the said John Little had against the congregation belonging to the Presbyterian Meeting-house in Long Lane in Boston aforesaid, with respect to his attendance upon and looking after the building of the said meeting-house, and all his accounts of charges and disbursements about the same, and the land whereon it stands, as also touching and concerning the said Little's purchase of the said land of Henry Deering, Esq., at the time of entering into the said bands of submission.

*Item.* We award and order that, upon the payment of the said sum, the said John Little shall make and execute in due form of law unto the said congregation a good lawful deed of conveyance of the land whereon the said meeting-house stands and is thereunto appertaining, with the privileges and appurtenances thereunto belonging, which the said Little bought and purchased of the said Deering as aforesaid, to hold the same unto the said congregation according to the tenures and after the same manner as the Church of Scotland hold and enjoy the lands whereon their meeting-houses are erected.

*Item.* We agree and determine and do hereby ascertain the right and interest which the said John Little hath in the said meeting-house to be the pew

NOVEMBER TERM 1854. 15

Attorney General *v.* Proprietors of the Meeting-House in Federal Street in Boston.

of his property, further than his contributory share, for which he was reimbursed by the reservation in the deed of a pew and seat in the meeting-house.

They deny that Little, Glen, Hall, Shaw and Knox and the other associates contributed land and money to found and support a Scotch Presbyterian church, and to create a trust or charity therefor; and aver that they contributed to the purchase of the land and the erection of the meeting-house, without any intent to create any charity, but with the simple purpose of erecting a meeting-house for their common use, to be held by them in proportion to the sums by them respectively contributed, and received equivalent rights, as pewholders, as a full consideration for their contributions. They deny that Little, Glen, Hall, Shaw and Knox had good right to create and establish, or to accept any such trust or charitable estate; and allege that they were bound, by the award, to execute a good conveyance to the congregation, by whose contributions and for whose benefit the land was purchased, and the meeting-house built. And they do not admit that it was the intention of said Little, Glen and others that the land should be forever used and enjoyed by a Scottish Presbyterian Trinitarian society, and none other.

and seat therein now in his possession, which is to remain good to him forever, in the same manner as the rest of the proprietors in the said meeting do hold and enjoy their respective rights and interests therein.

*Item.* We award and order that the said John Little shall assign, transfer, and make over unto the said George Glen, Edward Allen, Andrew Knox, George Southerland, William Hall, Daniel Macneal, Samuel Miller, Abraham All and William Shaw, as they are a committee chosen and appointed by the said congregation for managing the prudential affairs thereof, the outstanding debts due to the said congregation, amounting, as by account appears, to the sum of fifty four pounds five shillings, and shall invest them with all the power he the said Little is possessed of, in order to recover the same for the use of the said congregation.

*Lastly.* We award and order that the charge of this arbitration shall be borne and sustained by the said parties share and share alike. In witness whereof we have hereunto set our hands and seals, the ninth day of April, Anno Domini one thousand seven hundred and thirty five.

| | |
|---|---|
| | Jacob Sheafe, (Seal.) |
| Signed, sealed and delivered | Steph. Boutineau, (Seal) |
| in the presence of | Hugh Vans, (Seal.) |
| Daniel Marsh, Anth. Woulfe. | |

They say that by said deed the legal estate vested in the grantees in trust, but the beneficial estate was in the pewholders or *cestuis que trust*, and the trustees had no other substantial benefit than as pewholders, and thus the land and building were then purchased, acquired, owned and held by the associates as their private property, over which they had absolute dominion, and full power to change the use to which the same might from time to time be appropriated; that under this conveyance the trustees and *cestuis que trust* continued to use and enjoy the said premises, using the form of worship and church government mentioned in the deed, but that the entire interest, property and control was vested in the said trustees and *cestuis que trust*, being pewholders, as tenants in common.; that the title to each pew was a conveyance from the prudential committee, who were chosen from time to time, as vacancies occurred, by the pewholders; and that the proprietor of each pew had the right to sell and dispose of the same, like any other property, subject only to the condition of offering the same to the prudential committee at its appraised value. And they deny that Little or any other person made any charitable gift, or that any public charity was created or provided for; and therefore aver that this court, on this information and bill, has no jurisdiction over the same.

They say that they do not know the tenure of the lands held by the Church of Scotland in 1735; but that, if the facts and principles in regard to the tenure of lands held by the Presbyterian congregations in Scotland are truly set forth in the bill, they do not support this claim, because they flow from the fact that Presbyterianism was the established religion of Scotland, and as such recognized by law and clothed with peculiar privileges; but in Massachusetts, while a colony and province, and since it became an independent state, no form of faith or church government has ever been established or had any special privileges conferred upon it by law.

They admit the doctrine, government and discipline of the Church of Scotland in 1735 as set forth in the bill, and that they are opposed to Unitarianism, as professed and taught by the re-

spondents ; do not know whether the society in Long Lane con-formed in 1735 to the faith and discipline of the Church of Scotland; nor what version of the psalms was used by said Church of Scotland, or by said society; nor whether Little, Glen and others were Congregationalists, or Unitarians, or Pres-byterians; deny that said society continued until 1786 to be Presbyterian in all respects, and affirm that the pewholders had the exclusive interest in and control over the premises, and they or a majority of them had at all times a right to withdraw from the Presbyterian denomination, and about 1773 did so withdraw, with the purpose of changing their form of worship, and remained independent for ten years, choosing for themselves the ministers by whom occasional services were supplied to them.   They admit that the society was under the care of Morehead from 1727 to 1773, and of Annan from 1783 to 1786; but profess their ignorance as to the matters stated in the infor-mation concerning the Associate Reformed Presbyterian Church of North America, the connection of the society in Long Lane with the Presbytery of Boston, the Synod of New England, and the Presbytery and Synod of New York till 1782; deny that it since continued to be connected with the last; and do not know whether the relations of this society were affected by these changes; and profess their ignorance of the matters alleged con-cerning the establishment of the Presbyterian society in Boston in 1846, its faith and discipline, its relations to the Presbytery of New York, and the settlement of Blaikie.

They say that the proprietors of the meeting-house in Long Lane, in August 1786, did, by a unanimous vote of all persons legally or equitably interested in the said land and meeting-house, embrace the Congregational mode of government, and resolve themselves into a church and society different from a Scotch Presbyterian church and society, and that the same has ever since continued to be so.   They admit the instal-lation of Belknap, a congregational minister, in the congrega-tional form, and that he introduced a new collection of psalms and hymns; but do not know whether a minority of the congre-gation, or the Presbytery of New York, objected to his installa-

tion, nor whether he made any other changes in the forms, discipline or belief of the society ; admit that the premises have ever since been used and occupied by a congregational society, and that, after the date of said installation, the opinions of the pewholders and society underwent a gradual change, and they became a Unitarian society, but do not know at what particular time the said change took place, or whether it was in 1815. They admit that said society is, and has been for many years, a Unitarian society; but deny that the change in form of government in 1786, or this change of faith, was a perversion and abuse of the trust asserted to have been created by Little, and by Little, George Glen and others, or that it was contrary to the said deed, or that any trust or charity was created thereby.

They profess their ignorance whether in 1735 Unitarianism was known or could legally exist in Great Britain, Scotland or the colonies.

They admit that John W. Emery is a pewholder in the church named in the bill, but do not know whether he is desirous that it should be given up.

They admit that the premises in dispute are those known as Dr. Channing's church, &c., and that a demand was made and refused, as stated in the bill.

And they deny that said meeting-house and land, so conveyed by Little, were intended by Little, Glen and others for the sole use, occupation and enjoyment of said society in said deed mentioned, and of their successors forever in the manner as is stated in the bill, or that the same should be forever exclusively enjoyed by a Scottish Presbyterian Trinitarian society ; but they aver that said conveyance was intended by the grantor and grantees, and the other parties interested in the erection of said meeting-house, for their use and enjoyment and disposition as set forth in the answer.

To this answer a general replication was filed.

A hearing was had before *Bigelow*, J. who reported the case for the consideration of the whole court. So much of the evidence as is material to the understanding of the decision is accurately stated in the arguments and opinion.

*R. Choate & R. H. Dana, Jr.* for the relators. This is an information, coupled with a bill to secure the private interests of the relators.

The answer concedes that the respondents are a Unitarian Congregational society, and that their doctrines and discipline are inconsistent with those of the Church of Scotland, which are Trinitarian and Presbyterian. And it is well settled, as matter of law, that the difference between the Trinitarian and Unitarian theology, being deemed fundamental by the general consent of mankind, must be so treated by the courts, and that funds, given to support the teachings of one of them, are mis-employed and perverted, when applied to support the teachings of the other. *Princeton* v. *Adams*, 10 Cush. 132, and cases there cited.

If then this property is held in trust to be applied to the advancement of religion, according to the doctrine and discipline of the Church of Scotland, it is a perversion to apply it as now applied by the respondents. The question whether it is so held in trust depends mainly upon the construction of the deed of trust and the award. To ascertain this, it is proper to consider the parties who used the words, the circumstances under which they were used, the meaning attached to them at the time generally, or, if they were of a peculiar character, by the class of persons to whom the parties belonged, or in the locality in which they resided. *Attorney General* v. *Drummond*, 1 Con. & Laws. 210, and 1 Dru. & War. 353. *Case of Lady Hewley's Will*, *Shore* v. *Wilson*, 9 Cl. & Fin. 389, 525, 545, 556, 567, 579. *Milligan* v. *Mitchell*, 3 Myl. & C. 72. *Attorney General* v. *Murdoch*, 1 De G., Macn. & Gord. 128, 133 & seq. *Miller* v. *Gable*, 2 Denio, 540 & seq. *The People* v. *Steele*, 2 Barb. 405.

Among the principles of the Church of Scotland, adhered to by all Presbyterians, is belief in a visible church, instituted by our Savior Jesus Christ, to continue to the end of the world, having authority over all Christians; the object of which is to preach to all men a definite revealed gospel, and to administer divinely established sacraments and ordinances, for the salvation of men; and which derives none of its powers of disci-

pline in matters spiritual from the State; and has a body of rulers, teachers and ministers, appointed by the Savior, with authority to transmit their powers and mission to others, to be by them selected and ordained, in a perpetual succession, and by their commission in substantial parity. See Hetherington's History of the Church of Scotland, *passim.*

It is conclusively shown by the evidence that in the meeting-houses of the Church of Scotland, the title was in no one; the custody and administration of them was in the presbytery of the bounds and the heritors; but they were consecrated forever to the worship of God and the teaching of the gospel, according to the doctrine and discipline of the Church of Scotland; the congregation had no right of property, but only the enjoyment of the use; and neither the congregation nor the trustees could divert them from this use; and according to the universal polity of the Presbyterians in America, both in the United States and Canada, pewholders, as such, have not possessed the right of voting. See also *The State* v. *Crowell*, 4 Halst. 411; *Leslie* v. *Birnie*, 2 Russ. 114. It is admitted that the society in Long Lane was a Presbyterian society, so long as it remained under the charge of Morehead, from 1729 to 1773.

In England and Scotland, a denial of the doctrine of the Trinity was a capital offence down to 1813. *St.* 53 G. 3, *c.* 160. In Massachusetts, from the original settlement until long after 1735, the deepest interest was taken in securing the teachings of Orthodoxy. The persecutions of the Quakers, Baptists and others were promoted, upon principle, by the most conscientious men. In 1735, Unitarianism was unknown here, and it may be doubted whether it could legally have been preached. Until the adoption of art. 11 of the amendments of the constitution in 1833, the support of religion was compulsory on all, and no option was allowed to the tax-payers, except partially by *Sts.* 1799, *c.* 87, § 4, and 1811, *c.* 6. *Keith* v. *Howard*, 24 Pick. 292. *Oakes* v. *Hill*, 10 Pick. 333. The pewholding system was established here, but never carried with it the right of voting in parish meetings. *Sts.* 1786, *c.* 10, § 1; 1817, *c.* 184, § 1; 1823, *c.* 106, § 1; 1834, *c.* 183, § 1 The rights of the pewholders have

always been of a very limited character; they are not absolute owners of the property.   *Gay* v. *Baker*, 17 Mass. 435.   *Daniel* v. *Wood*, 1 Pick. 102.   *Kimball* v. *Congr. Parish in Rowley*, 24 Pick. 347.   *Fassett* v. *First Parish in Boylston*, 19 Pick. 361.   *Oakes* v. *Hill*, 10 Pick. 333.   *Jackson* v. *Rounseville*, 5 Met. 127. In poll parishes and voluntary religious societies, the pewholders do not necessarily possess the right of voting at all, and ordinarily not the exclusive right; but the right of voting depends upon the act of incorporation and by-laws.   *Taylor* v. *Edson*, 1 Cush. 522.

A charity is a dedication of property to the advancement of religion, the relief of the poor, or other objects of general public utility, and is exempted from the ordinary requirements, prohibitions and restrictions, imposed by law on the tenure, conveyance, descent and use of property, in the following particulars: (1.) There need be no grantee or devisee, capable of taking and holding by law.   (2.) There need be no *cestuis que trust*, sufficiently definite to enable a court of equity to execute a trust upon its ordinary principles.   (3.) Perpetuities are permitted. (4.) The statute of limitations does not act against them, either strictly at law, or by analogy in equity.   (5.) There is ordinarily no reversion to the heirs; but, if the specific object fails, the charity is applied *cy pres*.   (6.) Defects in tenure and conveyance are supplied.   2 Story on Eq. §§ 1136 *& seq.*, 1161–1171, 1187 *& seq.*   Shelford on Mortmain, 59–61, 71, 100.   Duke on Charitable Uses, *c.* 10.   Bac. Ab. Charitable Uses, E.   Boyle on Charities, 51, 52.   1 Spence Eq. Jur. 587.   *Earle* v. *Wood*, 8 Cush. 430.   *Parker* v. *May*, 5 Cush. 336.   *Winslow* v. *Cummings*, 3 Cush. 358.   *Going* v. *Emery*, 16 Pick. 107.   *Hadley* v. *Hopkins Academy*, 14 Pick. 253.   *Attorney General* v. *Pearce*, 2 Atk. 87. *Attorney General* v. *Pearson*, 7 Sim. 290.   *Shore* v. *Wilson*, 9 Cl. & Fin. 355.   *Attorney General* v. *Christ's Hospital*, 3 Myl. & K. 344.   *Incorporated Society* v. *Richards*, 1 Dru. & War. 258.   *Inglis* v. *Sailors' Snug Harbor*, 3 Pet. 118.   *Vidal* v. *Girard*, 2 How. 127.   *Kniskern* v. *Lutheran Churches*, 1 Sandf. Ch. 439. *Gable* v. *Miller*, 10 Paige, 627.

The award not only settled the pecuniary relations of the par-

ties, but determined the conditions of the enjoyment of the land by the congregation. This was done, either by virtue of an authority given by the submission, or by the mutual consent of the parties ; and, for whichever reason inserted, the terms so specified in the award were adopted *verbatim* in the deed, and assented to by all parties, and the deed is the only source of the title of the grantees.

That the deed from Little to Glen and others constituted a trust appears from its describing the grantees " in their capacity aforesaid, [of prudential committee,] and their successors in that trust," declaring a trust, in the habendum, in favor of the congregation, and adding a limitation that the congregation shall enjoy the lands after the same manner as the Church of Scotland enjoy the lands whereon their meeting-houses are erected. This conveyance could only be upheld as a charitable use ; for the grantees, not being a corporation, could not take in their official capacity, and transmit to their successors ; as an ordinary trust, it would be bad, for indefiniteness of the *cestuis que trust;* and for the same reasons the legal estate could not vest in the *cestuis que trust* under the statute of uses. *Earle* v. *Wood,* 8 Cush. 430.

It is admitted in the answer that the land was bought, and the house built, by the contributions of the members of the congregation, including Little. It is none the less a charity, that it was established by the contributions of several persons, and not by the gift or devise of one. *Attorney General* v. *Drummond,* 1 Con. & Laws. 220. *Attorney General* v. *Pearson,* 7 Sim. 290, and 3 Meriv. 353. *Craigdallie* v. *Aikman,* 1 Dow, 1, and 2 Bligh, 529. *Milligan* v. *Mitchell,* 3 Myl. & C. 72. *Attorney General* v. *Munro,* 2 De G. & Sm. 122. *Attorney General* v. *Murdoch,* 7 Hare, 445, and 1 De G., Macn. & Gord. 86. *Miller* v. *Gable,* 2 Denio, 492. *Robertson* v. *Bullions,* 9 Barb. 64. *The People* v. *Steele,* 2 Barb. 397. *Gass* v. *Wilhite,* 2 Dana, 178. *Curd* v. *Wallace,* 7 Dana, 190. It would seem that Little himself contributed the land ; for he paid Deering £550, as appears by the consideration expressed in Deering's deed ; and received from the congregation only £140, 5d., and that was awarded him for his

services and disbursements in building the house and preparing the land.

The allegation, in the answer, that the contributors were reimbursed by pews, is not supported by any evidence. The award does not show that Little's pew was a reimbursement; and there is no evidence that the others had any pews. But if the contributors had reserved a pecuniary interest to themselves, it would still be a charity. *Gass* v. *Wilhite,* 2 Dana, 178. *Miller* v. *Gable,* 2 Denio, 492. *Kniskern* v. *Lutheran Churches,* 1 Sandf. Ch. 443. Shelford on Mortmain, 71, 72, 88, 120.

This gift was of a sufficient public character to entitle it to the privileges of a charity. By public character, the law means only that it shall not be for the relief of specific persons, as mere personal benevolence to them. See authorities above cited, and *Rex* v. *Barker,* 3 Bur. 1265. In Massachusetts, as well as in other states of the Union, voluntary religious societies, incorporated or unincorporated, have always been held to be of a public character, and proper objects for information or mandamus. *Parker* v. *May,* 5 Cush. 338. *Earle* v. *Wood,* 8 Cush. 430. *St. Luke's Church* v. *Slack,* 7 Cush. 226. *The State* v. *Crowell,* 4 Halst. 390. *Green* v. *African Meth. Episc. Society,* 1 S. & R. 254. *The People* v. *Steele,* 2 Barb. 397. *Runkel* v. *Winemiller,* 4 Har. & McH. 429. *Brosius* v. *Reuter,* 1 Har. & Johns. 551. See also Com. Dig. Mandamus, A. This was a gift for the advancement of religion, not limiting the use of the land to the meeting-house, but leaving it open to any of the proper objects of a religious society, a pastor's house, a parish school, a parish library, free religious lectures, and perhaps a burial ground for the parish. *Beatty* v. *Hurtz,* 2 Pet. 584. It was not for the benefit of the contributors alone, but of all who might compose the congregation in all time. The worship and religious teaching in the voluntary religious societies of Massachusetts have always been public and open to all persons conducting themselves properly the administration of the ordinances, to all persons duly qualified; and this society is no exception. Although the pew system prevails, the service is still public, and places are usually reserved for the poor and strangers. But even if the doors were

closed to all but pewholders and those whom they chose to ad-mit, the trust would still be a charity, by reason of the great number of persons attending, and of the facts that the society owned the pews, and in case of a new building would again own them all, and might at any time alter or abandon the pew system, and that the right to secure pews was open to all.

The deed, then, creating a charitable trust, how is it to be con-strued? Independently of the clause, " according to the ten-ures," &c., the deed and award would still be construed by the established rules of interpreting religious charities, as limiting the trust to the benefit of a Presbyterian society. The society, by the subscriptions of whose members the land was bought and the house built, had been for several years before the establish-ment of the trust, and continued, confessedly, to be for forty years after, in strict Presbyterian connection, which implies the faith and discipline alleged in the bill ; indeed, the object of that connection is to ensure perpetual adherence to that system of faith and discipline. The parties to the award and grantees in the deed are described as a committee to represent that society, and the habendum is to them and their successors in that trust and office forever, and to the use of the said congregation for-ever, and for no other use whatsoever. These facts would of themselves limit the use.

But with the aid of that clause there can be no doubt. It is scarcely disputed that it designates a use, and that this use is the worshipping of God and the maintaining of a church govern-ment, according to the forms of a Presbyterian church. The only dispute is whether the worship and form of government are intended to be of perpetual obligation? The relators con-tend that they are. (1.) Because there could be no object in de-claring a use which might be altered the next day. (2.) Because such a use would be contrary to the genius and history of the Presbyterian Church. (3.) Because the deed uses the strongest terms, and in the closest connection, to indicate perpetuity. In many of the cases cited, terms of perpetuity were not used at all, and in none of them were they stronger than in this instru-ment. If the clause refers to the strict technical tenure of the

title, it refers not only to the "tenure" by which they "hold," but also to the "manner" in which they "enjoy" the lands, which last is sufficient to limit the use. But the clause does not even include the technical title; for the technical title in Scotland at that time was in no one, and that tenure could not be imitated here; nor did the deed attempt to follow it, but vested the title in trustees. The clause was first prescribed in the award, and copied in the indenture. The referees were not lawyers, and did not attempt to indicate the technical title; on the contrary, they ordered the deed to be made to the congregation; but it was in fact made to trustees. The clause then, when used in the award, did not indicate the technical title, and was not so treated by the parties to the indenture. The object of this clause was to refer to the Church of Scotland as a rule and model of the terms of enjoyment by the congregation; these terms were well settled in Scotland and well known to all Presbyterians; neither the congregation, the pewholders, the communicants, nor the heritors, nor all together, could vary the use; if it was perverted, it was vindicated by the church judicatory of the bounds. And these relators are the proper parties to vindicate it in this case.

The answer contends that the indenture and the *St.* of 1805 vest the title in the pewholders. It is matter of indifference to the relators in whom the legal title is; the question being on the use. The *St.* of 1805 cannot affect rights. *Dartmouth College* v. *Woodward*, 4 Wheat. 518. Neither is it material whether the trust was perverted by those lawfully representing the *cestuis que trust* at that point of time, or not; for if there was a permanent designation of the use, the beneficiaries of that day could not alter it; if there was not, the relators cannot prevail, whoever altered it. But there is no evidence that the pewholders had the right of voting in this society; and it is not probable that, contrary to Presbyterian usage, they had the right. In a case like this, the majority have no power to alter the trust. *Craigdallie* v. *Aikman*, 1 Dow, 1, and 2 Bligh, 529. *Milligan* v. *Mitchell*, 3 Myl. & C. 72. *Presbytery of Fordyce* v. *Shanks*, 11 Scotch Court of Sessions Cases, (2d series,) 1361. *The People*

v. *Steele,* 2 Barb. 397. *Field* v. *Field,* 9 Wend. 394. *Miller* v. *Gable,* 2 Denio, 525. Nor can the congregation pervert the trust by a unanimous vote. Parties who have come into possession, either lawfully or unlawfully, with knowledge of the trust (which has always been matter of record,) cannot set up a title in contravention of the trust. *Attorney General* v. *Munro,* 2 De G. & Sm. 163.

It is no objection to the execution of this charity that it has been diverted since 1815, or even since 1786. A charity is not within the statute of limitations ; it is not a case of open, adverse occupation ; the proper party is in possession of the fund or estate ; the beneficiaries are indefinite, perhaps not always in existence, and often have no right until they are nominated, and the perversion is often unperceived. *Incorporated Society* v. *Richards,* 1 Dru. & War. 258. *Attorney General* v. *Christ's Hospital,* 3 Myl. & K. 344. *Attorney General* v. *Coventry,* 3 Mad. 368, 369. *Attorney General* v. *Mayor of Bristol,* 2 Jac. & Walk. 321. 2 Story on Eq. § 1192 *a.* Shelford on Mortmain, 286, 563. Debates on Dissenter's Chapel Bill, 74 Parl. Deb. 596, 603, 605, and 75 Parl. Deb. 328, 332, 350, 360, 378, 379.

*S. Bartlett & G. S. Hillard,* for the respondents. This is an information, at the relation of parties named therein, to enforce a public charity ; and not an information joined with a bill, to both regulate a charity, and redress an injury to the private interests of the relators. 1 Dan. Ch. Pract. 15, 17, 20, 240. Mitf. Eq. Pl. 23, 100. Welf. Eq. Pl. 114. 1 Swanst. 305, *note. In re Bedford Charity,* 2 Swanst. 520. *Douglas* v. *Horsfall,* 2 Sim. & Stu. 184. *Parker* v. *May,* 5 Cush. 337. Debates on Dissenter's Chapels Bill, 279, 372, 375. *Milligan* v. *Mitchell,* 1 Myl. & C. 433. *Daniel* v. *Wood,* 1 Pick. 102. *Gay* v. *Baker,* 17 Mass. 435. *Jackson* v. *Rounseville,* 5 Met. 127. If the conveyance be found to create a trust not charitable, this bill, if in form a mere information, will not be retained to enforce it. And if the proceedings be by information and bill, in which the relator claims under one construction a title or interest in the charity, and so frames his bill, if he fails in his construction, the bill is dismissed. *Attorney General* v. *Oglender,* 1 Ves. Jr. 246.

In order to constitute a charity, and be the subject of an information, the property or fund must be devoted to some general or public purpose, as distinguished from donations founded on benevolence towards particular parties. *Attorney General* v. *Heelis*, 2 Sim. & Stu. 67, 76. *Ommanney* v. *Butcher*, Turn. & Russ 271. *Attorney General* v. *Haberdasher's Co.* 1 Myl. & K. 420. It must, to some extent at least, spring from gift or bounty and not be founded on an equivalent or consideration resulting to the parties from whom it is derived; though it does not lose its character by the donor's directly or indirectly sharing in its benefits, in common with the public. *Attorney General* v. *Heelis*, 2 Sim. & Stu. 77. *Attorney General* v. *Hewer*, 2 Vern. 387, and Duke, 681. *Anon*, 3 Atk. 277. *Babb* v. *Reed*, 5 Rawle, 151. *Thomas* v. *Ellmaker*, 1 Parsons Eq. Cas. 109. Bac. Ab. Charitable Uses, C. Hill on Trustees, 454. 1 Spence Eq. Jur. 587. 2 Spence Eq. Jur. 34. Jeremy on Eq. 247. *Parker* v. *May*, 5 Cush. 350–353. *Sanderson* v. *White*, 18 Pick. 328. *Gibson* v. *Armstrong*, 7 B. Monr. 489. *Attorney General* v. *Newcombe*, 14 Ves. 7. *Fearon* v. *Webb*, 14 Ves. 13. *Davis* v. *Jenkins*, 3 Ves. & B. 154. *Attorney General* v. *Parker*, 1 Ves. Sen. 43. And uncertainty in the individual objects is perhaps a necessary characteristic of a technical charity, arising from the contingent shifting application of the fund, embracing parties not known or in existence, and whose rights require protection. Binney's Argument in *Vidal* v. *Girard*, 47. 2 Kent Com. (6th ed.) 288, *note*. *Moggridge* v. *Thackwell*, 7 Ves. 36. *Attorney General* v. *Cock*, 2 Ves. Sen. 273. Boyle on Charities, 312, 313, 315. *Grieves* v. *Case*, 4 Bro. C. C. 68, and 2 Cox, 311. 2 Domat's Civil Law, (Amer. ed.) §§ 3585–3587. *Attorney General* v. *Bucknall*, 2 Atk. 328. *Isaac* v. *DeFriez*, 17 Ves. 373, *note*. *White* v. *White*, Boyle, 34. *Attorney General* v. *Price*, 17 Ves. 371. *Bishop of Hereford* v. *Adams*, 7 Ves. 324. *Attorney General* v *Corporation of Exeter*, 2 Russ. 47. *Attorney General* v. *Wilkinson*, 1 Beav. 370. Dissenting opinion of Underwood, J. in *Gass* v. *Wilhite*, 2 Dana, 185.

The conveyance from Little to Glen and others is wholly wanting in the element of gift or bounty. It evinces a purchase by as-

sociated parties, as alienable transmissible property, for their own uses; the legal title, to accomplish their purpose, being vested in trustees, called a committee for managing their prudential concerns. The individual objects are fixed and certain, namely, the parties who furnished the purchase money, their heirs and assigns. The terms "congregation" and "proprietors of pews" are used throughout the deed as convertible terms.

The purchase of the land and construction of the church were made by Little in trust, and from the funds and resources, and on the credit of the congregation belonging to the Presbyterian meeting-house in Long Lane. The deed from Little to Glen and others refers to, and thus incorporates the award of Sheafe and others. That award shows that the subjects of arbitration were the claims and demands of Little "*against the congregation*," "with respect to his *attendance upon and looking after the building of the said meeting-house*, and all his accounts of charges and disbursements about the same, *and the land* whereon it stands, as also touching and concerning the said Little's purchase of the said land;" also "the outstanding debts due to said congregation," which Little seems to have held as security, and which he was directed by the award to make over to Glen and others, the prudential committee of the congregation. The award is decisive that the congregation, and not the committee, furnished the funds; it directs Glen and others (afterwards declared to be a committee of the congregation) to pay Little £140 5*d.* in full of all his claims and demands "against the congregation;" and it determines Little's right and interest in the meeting-house to be "the pew and seat therein now in his possession, which is to remain good to him forever in the same manner as *the rest of the proprietors in said meeting* do hold and enjoy their respective rights and interests therein," thus showing that "the congregation," for whom Little purchased the land and built the house, are "the rest of the proprietcrs in said meeting," who hold the pews.

A design, on the part of a congregation using and enjoying in severalty pews in a house of worship erected at their expense, to devote such house and pews to a public and general use, by

conveying it to trustees, not for themselves, but to support a particular form of worship, cannot be inferred, unless clearly expressed in the conveyance, especially when no action of the proprietors is shown, but the conveyance is founded upon the award of third parties. The award directs a conveyance to " the said congregation," (who, as has been seen, are the proprietors of pews,) and not to trustees, nor to any congregation who may hold particular tenets ; yet not a conveyance of the whole title, but reserving to Little, who held that title, his pew forever, showing by this clause that the house was divided into pews, that the pewholders had several rights and interests therein, and that those rights were to " remain good to them forever." The deed, made two months afterwards, to trustees, and not to the congregation, as directed by the award, places the question of proprietorship beyond controversy. It recites that the trustees who receive the conveyance are acting " for themselves," and " as a committee appointed by the rest of the congregation for managing the prudential affairs thereof "—both inconsistent with taking in trust for a public charity. The reservation to Little, even more clearly than in the award, shows that the interests both of Little and of the rest of the pewholders were property capable of alienation and of transmission. The habendum is " to and for the only proper use, benefit and behoof of *the said* congregation, forever," and not of any present or future congregation who might hold any particular tenets.

Assuming, then, that this property was purchased by the associates for their own use, and that the whole equitable title was, and was intended to be vested in them, and designed to be alienable and transmissible as property, a construction consistent with this must be given to the clause by which, after declaring that the property is to be held for " their only proper use," and fully describing the tenure, the deed adds " according to the tenures and after the same manner as the Church of Scotland hold and enjoy the lands whereon the meeting-houses are erected ; " for, if repugnant, it must be rejected. 4 Cruise Dig. (Greenl. Ed.) tit. 32, c. 20, § 25 & note. 23 Amer. Jur. 277, 278. The clause is inartificially expressed ; for in Scotland, in 1735, the state, and

not the church, held the lands on which the meeting-houses were erected. It is probable, from the known perpetuity of use to which such lands are held in Scotland, that the intent was to indicate a perpetuity of trust; but this would be a mere private trust, to be settled between the trustees and *cestuis que trust*, and not a charity to be carried into effect by a public prosecution.

The omission of words of inheritance, or other defect in the conveyance, will not convert a purchase into a charity. The utmost effect of such an omission would be to establish a resulting trust in favor of the congregation who furnished the consideration, or to leave the title in the grantor. But, without words of inheritance, the trustees will take an estate commensurate with the nature of the trust. *King* v. *Parker*, 9 Cush. 81. *Stevens* v. *Palmer*, 10 Met. 32. *Brooks* v. *Jones*, 11 Met. 191. *Gould* v. *Lamb*, 11 Met. 84. Either the title or use became vested in the *cestui que use*, or remained in the trustees and their heirs, and became vested in the respondents by *St.* 1805, *c.* 6. *Earle* v. *Wood*, 8 Cush. 430. This statute is in the character of a legislative grant or confirmation of a grant, and settles the uses to which the property is held. Angell & Ames on Corp. (4th ed.) § 169. *Bangor House Proprietary* v. *Hinckley*, 3 Fairf. 385. *Baptist Church* v. *Witherell*, 3 Paige, 296.

Even if the deed had not expressed in terms that the meeting-house was to be held for the proprietors of pews, their heirs and assigns; and the habendum had been simply in trust, to hold " according to the tenures, and after the same manner as the Church of Scotland hold and enjoy the lands whereon the meeting-houses are erected;" the use would, in this commonwealth, vest in the pewholders or congregation, to be enjoyed by them and their assigns, notwithstanding any change of tenets or creed ; and this would be true if the conveyance had originated in gift or bounty—*a multo fortiori* when the estate was purchased by parties associated for religious worship. Anc. Chart. 103, 117, 255, 286, 433, 607. *Baker* v. *Fales*, 16 Mass. 488. *Stebbins* v. *Jennings*, 10 Pick. 172. *Avery* v. *Tyringham*, 3 Mass. 160. *Page* v. *Crosby*, 24 Pick. 211. *Congr. Soc. in North Bridgewater* v. *Waring*, 24 Pick. 304. *Manning* v. *Fifth*

*Parish in Gloucester*, 6 Pick. 19. *Richardson* v. *Butterfield*, 6 Cush. 195. *Parker* v. *May*, 5 Cush. 336. Declaration of Rights, art. 3. 3 Monthiy Anthology, 632. 3 Dane Ab. 168. *Riddle* v. *Stevens*, 2 S. & R. 543. The English doctrine, as established in the case of *Lady Hewley's Will*, and other comparatively recent cases, that, where the terms of the deed of foundation are not clear and precise, but obscure, doubtful and equivocal, the religious tenets of the founder, as well as of the first objects of the bounty, are open to parol evidence, and, when ascertained, will govern and limit the uses of the charity, ought not to be applied to the religious institutions of this country, where, looking at the great diversity of religious opinion, and the changes constantly occurring therein, nothing but the clearest and least ambiguous terms should be construed as intending to stereotype a particular creed or form of worship. 2 Story on Eq. § 1191 *a, note. Miller* v. *Gable*, 2 Denio, 540, 549. *Baptist Church* v. *Witherell*, 3 Paige, 296. *Smith* v. *Nelson*, 18 Verm. 554. 1 Greenl. Ev. § 295, *note.* The clause in the deed, in terms, relates only to the tenure and manner of holding land by the Church of Scotland, and has no reference to the creed or forms of that church. If it was intended to perpetuate a creed or form of worship, it is extraordinary that no word referring to it, even by inference, is to be found in the deed.

The use, if ever established, was changed by vote of the congregation. The allegation of the bill, that a minority opposed the change, is unsupported by evidence, and disproved by the answer. Besides; the courts of this country have never recognized the legal existence of conventions, assemblies, synods, presbyteries, or associations; but single churches or congregations are alone known to the law as corporations; and in these, as a general rule, the majority have the right to make changes. *Organ Meeting-house* v. *Seaford*, 1 Dev. Eq. 453. *Keyser* v. *Stansifer*, 6 Ohio, 363. *Baptist Church* v. *Witherell*, 3 Paige, 304. *Lawyer* v. *Cipperly*, 7 Paige, 281. *Commonwealth* v. *Green*, 4 Whart. 531 *Presbyterian Congregation* v. *Johnston* 1 W. & S. 1. *Skilton* v. *Webster*, Brightly, 203. *Smith* v. *Nelson*, 18 Verm. 511. *Case of St. Mary's Church*, 7 S. & R. 547. *Miller* v. *Gable*, 2 Denio, 546, 548, 561.

The statute of limitations of this commonwealth is a complete bar to the suit, whether it proceeds upon the ground of enforcing a technical charity, or a mere trust; for any right of action for the recovery of lands, even by the Commonwealth, is barred by twenty years' adverse possession. Rev. Sts. *c.* 119, §§ 1, 12. These defendants have held the premises more than forty years, as disseizors, not professing to hold under the deed, as construed by the plaintiff, but by claim of right under *St.* 1805, *c.* 6, purporting to transfer the property to them. The settled doctrine, that as between trustee and *cestui que trust* the statute is never a bar, rests wholly on the ground that the possession of the trustee is the possession of his *cestui que trust*, and not adverse. *Farnam* v. *Brooks*, 9 Pick. 242. *Hemenway* v. *Gates*, 5 Pick. 321. *Beckford* v. *Wade*, 17 Ves. 83, 97. *Hovenden* v. *Annesley*, 2 Sch. & Lef. 633. *Wedderburn* v. *Wedderburn*, 4 Myl. & C. 52. It is equally well settled that the statute does bar the remedies of both trustee and *cestui que trust* against a stranger who commits a disseizin of the trust estate. *Lewellin* v. *Mackworth*, 2 Eq. Ca. Ab. 579. *Hovenden* v. *Annesley*, 2 Sch. & Lef. 629. *Pentland* v. *Stokes*, 2 Ball & Beatty, 75. *Cholmondeley* v. *Clinton*, 2 Jac. & Walk. 171–175, 191. In England, before *St.* 3 & 4 W. 4, *c.* 27, courts of equity did not hold the statute of limitations to apply to constructive trusts, but acted upon them as furnishing analogies to govern their decisions; but in this commonwealth the statute has been held uniformly, by its own force, to embrace all constructive trusts, and be capable of being pleaded in bar. 2 Story on Eq. § 1520. *Commissioners* v. *Wybrants*, 2 Jones & Lat. 182. *Farnam* v. *Brooks*, 9 Pick. 242. *Baker* v. *Atlas Bank*, 9 Met. 195. The doctrine sometimes laid down by the English courts, that trusts for charity, like implied or constructive trusts, were not barred by the statute of limitations, but only by laches in the parties interested, has usually been in suits against an acknowledged trustee of a charity who has abused or perverted it. To cure this defect, the *St.* of 3 & 4 W. 4, *c.* 27, was passed, which embraces constructive trusts in cases of charity. 2 Jones & Lat. 182. And our statute, having always embraced constructive trusts, must be deemed to embrace charities.

The pewholders are the real parties defendant in equity, and are not affected by the history of the title previously to *St.* 1805, and are therefore *bona fide* purchasers without notice; and this is a complete defence in the case of a charitable estate, as well as in others. *Attorney General* v. *Gower*, 2 Eq. Cas. Ab. 195.

The opinion was delivered at March term 1855.

SHAW, C. J. This cause has been very elaborately, and, we may add, ably and ingeniously argued, and the court have been gratified and greatly aided and enlightened by the argument. Yet we cannot avoid feeling a great anxiety respecting the result, principally on the ground that the questions are to a great extent new in this commonwealth, and that the decision may deeply affect important rights, not only of these parties, but of others, as a precedent, in matters of vital importance to the best interests of a civil and religious community. Our difficulty does not arise from want of great learning and research, and a citation of numerous cases. Our perplexity rather arises from the great abundance of cases which have been decided in Great Britain, and in the other states, having analogies more or less direct to the subject. They are numerous, and indicate an amount and scope of legal learning and judicial discrimination which require much time and study to enable us to understand all their bearings. But, considering to what an extent the ecclesiastical institutions of Massachusetts have been modified by law and long established usage, we fear that we cannot, in a case like this, adopt the judicial decisions of England and other states, or the reasons and principles on which they are founded, with the confidence with which we are glad to repose on them in most other cases drawn into controversy in our courts.

The great subject of inquiry is, what were the purposes and intentions of those persons who founded and provided a place for public worship in Long Lane, in 1730–35; what were their acts and doings; how were such acts affected by the law of the land as it then stood; and what were the relative rights and duties of the grantees named, of the other members of the body associated to provide a place of public worship, and of other persons, in the lot of land then conveyed as the site of a meeting-house.

The law, as it existed at that time in the State generally, and in the town of Boston in particular, must be resorted to, to ascertain the character and legal effect of the transaction. Whatever may have in fact been the tone of public sentiment in the earliest times of the colony, in regard to religious liberties and privileges, it is believed that the legislation, especially in the celebrated " Body of Liberties " set forth in 1641, was somewhat in advance of public sentiment on this subject. Indeed, whatever spirit may have dictated the severe laws against the Quakers, Anabaptists and others, those laws do not profess to be levelled against the articles of faith of those obnoxious sects, but against disorderly acts and practices tending to an interruption of the peace and order of the colony. The charge against the Quakers was not alone for speaking and writing blasphemous opinions, but as a sect despising government and the order of God in church and commonwealth.

But whatever may have been the prevalent sentiments or laws of the earlier settlers of the colony, which may be rather matter of curious speculation than of present practical importance, we have no doubt, that in 1730, nearly a century after the settlement, and nearly forty years after the adoption of the Province Charter, a great change had taken place, and a practical toleration, if not established before, was in full operation. Indeed, it was but a few years after this, in 1757, that an act was passed, conferring on the Quakers and Anabaptists, before denounced, the special privilege of being exempted from taxation for supporting ministers and building meeting-houses. Anc. Chart. 782. And this act is introduced by a preamble, reciting that several acts previously granting the same exemption to these sects, had expired. From this we derive the conclusion that they had been so exempted for a considerable time previous.

We are aware of no law, which at that time (1735) prohibited the profession of any mode of Christian faith, or any form of Christian worship, conducted honestly and soberly ; but, on the contrary, several religious societies, of different denominations, had then been formed, and so far as the profession and inculcation of doctrine was concerned, the principle was substantially

adopted, which was afterwards embodied in the constitution by the third article of the Declaration of Rights.

But, in modern times, the provision of a place and other means of public worship, according to Protestant ideas, implies the assembling of a body of persons together, for the general services of public worship, and for religious instruction; and as connected therewith, a select body, formed and connected together by covenant, who constitute a church in full communion, invested, among other things, with the especial duty and privilege of administering the Christian ordinances. Assuming that such was the purpose of those, who associated to build a meeting-house in Long Lane, it is proper now to consider how the law stood in 1730 in regard to parochial as well as ecclesiastical relations, in order to understand the rights, duties and powers of parishes and religious societies, in the Province of Massachusetts.

From the earliest settlement of the colony, the territory, as fast as it was granted out to actual settlers, was divided into territorial parishes, and each parish was a corporation. In many cases, towns constituted parishes; that is, each town was a corporation, combining all the powers and functions both of a parochial and of a municipal corporation, and, under one organization, provided for the erection of meeting-houses, the support of public worship, and incidental expenses. Large towns were sometimes divided into two or more territorial parishes, in which case, each parish was a corporation, with its proper organization and officers. It was made the duty of these corporations, as a civil obligation to be enforced by law, to provide for the maintenance of public worship, and the support of suitable ministers and religious teachers. One of the earliest of the provincial statutes imposed this duty upon towns, manifestly understanding that in that statute the term "town" is used as synonymous with "parish," because, in the great majority of cases at that early period, towns were parishes. St. 4 W. & M. (1692,) Anc. Chart. 243. At the succeeding session, an act was passed, partly repealing and partly amending and explaining this act. It quotes a passage as contained in it, which I do not find in the

act as published, to this effect, "that every minister, being a person of good conversation, able, learned and orthodox, that shall be chosen by the major part of the inhabitants in any town, at a town meeting, duly warned, shall be the minister of such town, and the whole town shall be obliged to pay towards his settlement and maintenance, each man his several proportion thereof." The statute containing this recital then proceeds, upon further consideration of this section, and the impracticableness of this method for the choice of a minister in divers towns, where there are more churches than one, to repeal the foregoing section in said act, confirming the other parts of the act; and then provides that each respective gathered church in any town or place within the province, that shall at any time be in want of a minister, shall have power, according to the word of God, to choose their own minister; and the major part of such inhabitants as do usually attend on the public worship of God, and are by law duly qualified to vote in town affairs, concurring with the church, the person thus elected and approved, shall be the minister and all the inhabitants and ratable estates lying within such town or part of a town, or place limited, (territorial parish,) shall be obliged to pay in proportion. Anc. Chart. 254, 255. There is a proviso annexed to this section which I shall have occasion to refer to hereafter, and therefore will cite it here: " Provided, that nothing herein contained is intended, or shall be construed to extend, to abridge the inhabitants of Boston of their accustomed way and practice as to the choice and maintenance of their ministers."

It will be perceived by the above act, that when a town constituted a parish, or part of a town constituted a territorial parish, the minister was to be elected by the concurrent act of the church and of the inhabitants; to this a slight modification was made, a year or two after, providing for the case when the congregation would not concur with the church in their choice. *St.* 7 W. 3, Anc. Chart. 286.

From this view, it will appear, that from a period immediately after the adoption of the Province Charter in 1692, if not earlier, the people composing a parish and religious society,

though bound as a civil duty to support public worship and provide for religious instruction in some form, yet were under no restraint as to what denomination they would assume, what modes of Christian faith they would embrace and inculcate, or what form of protestant worship they would adopt and follow. There was not only a full toleration by the law in this respect, but all protestant denominations were placed on an equal footing, in regard to the rights of conscience and property, in religious concerns.

We must now consider what were the legal rights of property in church edifices, the lands on which they stood, and lands incident to and connected therewith, including a house for the minister. So long as towns remained of moderate and convenient size, and acted in the double capacity of town and parish, or where a large town was divided into two or more territorial parishes, (which was the condition of the whole state except Boston,) the rights of property were plain. The legal seizin of the entire realty was in the corporation. A town or parish was a corporation, capable of taking and holding real estate, and there was no difficulty therefore in saying that the fee of the land was in the corporation. But they hold this property to a special use, that of the support of public worship; and as the interests of the corporation, and of all its members, would be generally the same, there would seldom be any question about the rights of property. But there is another species of property connected with these church edifices to be considered, that of pews. We believe it was the practice in most of the territorial parishes, as well as in poll parishes hereafter to be mentioned, to appropriate a part of the area of each church to the erection of pews, which were usually sold, and the proceeds applied to the cost of the erection, or to the settlement and support of the minister, or other parish purposes.

The right to a pew, except in Boston, was regarded to many purposes as real estate, in which the proprietor had a freehold, for the invasion of which, a writ of entry, trespass *quare clausum* and other legal remedies, adapted to vindicate rights to real estate, were, and ever have been in constant use. But in its nature

it was a freehold and estate of peculiar character, held in subor-dination to the corporation, who are the sole owners of the soil.

So where poll parishes were established, they were uniformly constituted corporations by special act of incorporation, such an act was an enabling act, creating a corporation having perpetual succession, and capable of holding real estate to a limited amount; and in such case the fee was in the corporation, to the use of pewholders and other members.   *Gay* v. *Baker*, 17 Mass. 435.

But whatever may have been the law generally in the colony and province, by which the territory was divided into parishes, and every person dwelling therein was required to contribute to the support of public worship, if not specially exempted, it never did apply to the town of Boston.   Probably because its numbers increased so rapidly, and it was so early found that more than one religious society would be necessary within its limits, it is believed that no attempt was ever made to organize the town as a parish, or to divide the territory into parishes.   Religious soci-eties were merely voluntary, and were freely formed and main-tained by persons associated together for the purpose ; and of course they were formed upon such views of doctrine and disci-pline, and professed and inculcated such religious doctrines and tenets of belief, as their own consciences and views of Christian truth dictated.   We have already cited the provincial act of 1693, exempting the inhabitants of Boston from the operation of a general law, and by implication giving a sanction to their "way and practice" as to the choice and maintenance of their ministers.

The statute of 28 G. 2, (1754,) though mainly designed for another purpose, that of giving limited corporate powers to the deacons of Congregational churches and to the wardens of Epis-copal churches, to take and hold gifts to pious uses, contains a separate section upon this subject.   The preamble recites, that " the several congregations in the town of Boston, and some others under the like circumstances, are not by law enabled by vote to raise money for the support of the ministry and public worship among them ; " and the act provides that in such cases,

where there is no adequate provision by law, (that is, we suppose, where not incorporated by law with the power of taxation,) they may, at a public meeting of proprietors of pews, or persons to whom they are allotted, called for that purpose, cause the several pews to be valued and taxed, the money to be applied to the support of the ministry and other necessary charges. It also provides that such proprietors may choose a clerk, and treasurer and collector. This last clause, to a certain extent, vested such body of proprietors with corporate powers, where they were not incorporated by law. Anc. Chart. 607.

Without multiplying authorities, we take it to be perfectly well established as matter of history, that the inhabitants of Boston never were compellable by law to pay taxes for the support of public worship; that all religious societies were formed by voluntary association of those generally entertaining similar religious views in faith and practice. And it is believed that in many instances, if not the majority, these associations were not incorporated as poll parishes. At the early part of the present century, several religious societies were specially incorporated, probably for greater caution, though they had been in existence a great many years, and some of them from the earliest settlement of the town. For instance, the New North, June 22d 1803, one of the oldest; the New South, June 23d 1803, which had been in existence nearly a century. In other instances new and old societies were invested with new and additional corporate powers, as the First Church, worshipping in a meeting-house called the Old Brick, which was actually the first religious society established in Boston, and the church in Brattle Street, by one and the same act, February 22d 1803. This last contains a clause requiring these societies, in all proceedings touching taxation, to conform to the laws in being, governing taxes of that nature in the town of Boston, saving the rights of proprietors of pews. This provision implies some peculiar laws in force on this subject, in Boston.

Supposing then that most of the old societies of Boston were formed by association, without any act of incorporation, and there being no other body capable in law of taking and holding

the fee and legal estate of the land to be used for a church edifice and its incidents, the natural expedient which would present itself, when an agreement had been made by an unincorporated body of persons, associated together to form a new religious society, with the owner of the land, for its purchase, to take a deed to and for the use and benefit of the whole, in the names of a few, who in their natural capacity could take and hold the legal estate in fee and in trust for those who had thus associated to form such society, and who had raised the money for that purpose. In such case, the trustees would hold nearly the same relation to the pewholders, the contributors and the members of the society so associated, as the corporation, whether of a territorial or poll parish, would hold to the members; the legal estate would be in the trustees, and the entire use and beneficial interest in the members of the society. Such trustees might, and naturally would be, members of the association, most likely active members, and as such would have an equal share in the use and beneficial interest with other members.

Such being the parochial and ecclesiastical condition of the Province of Massachusetts, and especially the town of Boston, in 1730, and such the circumstances under which the society in Long Lane, now of the respondents, was formed, we proceed to examine the acts done and the facts disclosed by the evidence, in order to judge of the character of the institution there founded.

The first question, and that which lies at the foundation of this prosecution, is, whether this transaction constitutes a public charity.

After this lapse of time, and in the absence of full records, we must depend, for the facts, mainly on the deed of Little to Glen, and the award of referees in pursuance of which it was made, the recitals contained in these documents, and the inferences of fact to be fairly drawn from them.

From these documents, we think it is clearly proved that John Little, George Glen and many other persons had associated and united themselves together to erect a Presbyterian meeting-house, for public worship, as early as 1729 or 1730; that they had

agreed with Deering for the lot of land, at the price of £550 nearly two thousand dollars; that they agreed with John Little, one of their number, that he should take a deed from Deering in his own name, but for the benefit of the society; that he should proceed and make contracts for labor and materials, and erect a suitable house; to enable him to do which, the money raised by the associates, and probably the notes or obligations of some who did not pay money, were placed in Little's hands, as the common agent.   After four or five years, and probably after the meeting-house was nearly or quite finished, and after pews had been formed, and some of them, if not all, sold or otherwise appropriated to some of the members of the society, a controversy arose, between Little on the one part and the congregation on the other, in regard to their rights.   We say between Little and the congregation, because, although the award itself states it to be between Little on the one side, and Glen and others, nine in all, on the other, yet the matter of the award shows it to have been a controversy with the congregation, concerning his accounts as their agent.   Not being a corporation, they could not legally act in an aggregate name as a corporation; and their trustee being the adverse party, they must necessarily act by some of their own members for the rest.   It is to be regretted that the submission under which the award was made cannot be produced; as it is, we can only read it by the reflected light appearing in the award.

The award first directs that said Glen and others, naming the nine, within the space of two months, pay or cause to be paid to Little the sum of £140, 5*d.*, which shall be in full of his demands against the congregation belonging to the Presbyterian Meeting-house in Long Lane in Boston, " with respect to his attendance upon and looking after the building of the said meeting-house, and all his accounts of charges and disbursements about the same, and the land whereon it stands, as also touching and concerning the said Little's purchase of the said land of Henry Deering, Esq."   It appears, therefore, that he had purchased the land, in his own name, at £550; that he had attended to the building of said meeting house, and charged his disburse

ments about the same, and also his disbursements for the land. Supposing the cost of the house two or three times that of the land, £1200 or £1500, and the balance due to him £140, it follows that he had received the difference in cash, or securities from which he had realized cash, from the various members of the congregation, or from other sources, as gifts to the congregation.

The referees next award that, upon the payment of said sum of £140, 5d., Little shall make " unto the congregation " a good lawful deed of conveyance of the land, meeting-house and appurtenances, " to hold the same unto the said congregation, according to the tenures and after the same manner as the Church of Scotland hold and enjoy the lands whereon their meeting-houses are erected."

They next award that the right and interest which Little has in the meeting-house is the pew and seat therein, now in his possession, " which is to remain good to him forever, in the same manner as the rest of the proprietors in the said meeting do hold and enjoy their respective rights and interests therein."

They then award that Little shall assign to Glen and others, the nine named, as they are a committee chosen and appointed by said congregation for managing the prudential affairs thereof, all the outstanding debts due to the congregation, amounting to £54, 5s., and they divide the costs between the parties.

It is to be remembered here, that by the award, the deed was to be made to the congregation, the referees probably not being aware that by the rule of law, existing then as well as now, a conveyance could not be legally made to an unincorporated body of individuals, by an aggregate name; and that such a deed would be inoperative and void.

Another thing to be observed is, that, at the time of the submission and award, the congregation were represented by a com mittee of nine of their number, as a prudential committee; and at the time of the conveyance, two months afterwards, four only were representing the congregation, and acting as a prudential committee, showing, in both cases, that the persons named were agents, and the congregation were the party in beneficial interest.

We then come to the conveyance in the form of an indenture, made June 9th 1735. It is made between John Little on the one part, and Glen, Hall, Shaw and Knox, " for themselves and as a committee chosen and appointed by the rest of the congregation belonging to the Presbyterian Meeting-house in Long Lane in Boston, for managing the prudential affairs thereof," on the other part. The deed then, by apt words, in consideration of £140, 5*d.*, the precise amount of the balance awarded Little, conveys to Glen, Hall, Shaw and Knox, the land, (bounded and described,) also the meeting-house on the same, with all privileges; reserving to Little, the grantor, his heirs and assigns, the pew and seat therein then in his possession, to remain good to him, his heirs and assigns forever, in the same manner as the rest of the proprietors do hold and enjoy their respective rights, which right was ascertained by the award of Sheafe, Boutineau, and Vans; to have and to hold the land, meeting-house, premises and appurtenances (saving and reserving as aforesaid) to said Glen, Hall, Shaw and Knox, " in their capacity aforesaid, and to their successors in that trust and office forever, but to and for the only proper use, benefit and behoof of the said congregation, (according to the tenures and after the same manner as the Church of Scotland hold and enjoy the lands. whereon the meeting-houses are erected,) forever, and for no other use, intent or purpose whatsoever," with warranty.

We have now to inquire what effect this conveyance had upon the rights of the respective parties. In the first place, it seems quite clear that it transferred the premises, and vested the entire legal estate in the four grantees. We say nothing at present as to the quantity of estate, whether for life or in fee; we shall consider that point hereafter. A good legal estate passed from the grantor, and vested in the grantees. But it was so vested in them to and for the only proper use, benefit and behoof of the said congregation forever, and for no other use, intent or purpose whatsoever. This created an estate in trust; for though the words " in trust " are not used in this deed, yet, as the habendum is to them and their successors in that trust, it sufficiently describes them as trustees by implication. But further, and this

puts the matter beyond doubt, where property is conveyed to the use of a party not capable of taking the legal estate, it cannot vest in the *cestui que use,* by the statute of uses; therefore, by a well known rule of construction early engrafted on the St of H. 8, it constitutes an estate in trust in the first takers. They therefore took an estate in trust for the congregation. Though the term congregation, as in the present case, designates a number of persons associated, but not incorporated, so that they are incapable by law to take a legal estate by such conveyance, yet it is a good description of persons who may be *cestuis que trust,* and beneficially interested. In general, it may be said that the congregation, before the sale of pews, consists of those who have in fact united together, and by mutual agreement under seal, or by any less formal mode, by the subscription of papers or otherwise, have agreed to form a religious society, and have contributed, or bound themselves to contribute, towards the cost of buildings and the support of public worship. As agreement and union are the essence of such voluntary religious societies we are not prepared to say that persons not able to contribute to the pecuniary means of such society, but otherwise capable of being useful and desirable associates, might not be received as members. But as there is nothing to show that there were any persons included in this congregation but those who had contributed or promised money, it is not necessary to go further than to determine that those who have thus united and contributed shall be deemed members. Where pews have been sold, or have been assigned and set apart, to be held in severalty, this is conclusive evidence that such pewholders are members of the congregation. If such pews are sold and assigned to contributors, (and most of them probably would be, because it is a probable conclusion that the largest contributors and the most efficient promoters of the enterprise would be likely to take pews,) they would of course be members. But even if sold to strangers, it must be in pursuance of some by-law or regulation agreed upon by the actual associates and members of the congregation, and therefore such sale of a pew would be conclusive evidence of their assent to accept and receive such purchaser of a pew as an associate and member.

The right to a pew, although everywhere in Massachusetts it is regarded as property, and, in every part of the State except Boston, as real estate,[*] and in Boston as personal estate, yet it is property of a peculiar nature, derivative and dependent. It is an exclusive right to occupy a particular portion of a house of public worship, under certain restrictions. The owner of a pew is not a tenant in common of the estate on which the house stands; the legal estate is in the corporation, if the religious society be one, or in the trustees, if the property be vested in them to the use of the congregation, forming a religious society for public worship. Whoever else, therefore, may be, or claim to be, *cestuis que trust*, the holders of pews are clearly entitled to stand in that relation. For whom then were these grantees constituted trustees? The answer is, for a body of individuals who had united together and contributed of their means to purchase land and erect a house of public worship—a body of individuals as capable at that time of being designated, ascertained and identified by proof, as if they had been actually enumerated in the deed. It is no answer to this that now, after the lapse of over a century, when all parties are long since dead, and no records can be produced, it would be difficult to ascertain and prove who were then designated under the name " congregation." Nor is it material. The character of the conveyance must be ascertained by the facts as they existed at the time it was made. And it appears to us that it was a conveyance in trust for the sole use of a religious society, consisting of persons who had united to form a religious society, had contributed the whole amount necessary to purchase the land and build the house, and had caused a conveyance to be made to several persons, to hold in trust for them, because they were incapable in law to take the legal estate to themselves as an aggregate body. It was a mere naked trust; the whole beneficial interest was in the contributors, the congregation ; and even the reservation to Little himself was not a reservation or exception out of the fee,

---

[*] By *St.* 1855, *c*, 122, pews in all houses of public worship are made personal property.

but it implied a previous conveyance or assignment to him, as a contributor and member of the congregation, of that peculiar property which one may have as the holder of a pew, and manifested an intent not to relinquish that right, which the general words of the deed might be otherwise construed to do. If all the contributors had at that time taken pews, then it would be strictly in trust for pewholders. But if otherwise, it would not affect the character and legal operation of the deed, because it would still be for certain persons, capable of being ascertained and identified; not so clearly, perhaps, as if they had taken deeds of pews, which are usually recorded; but quite as effectually, it may be, by records, or books in the nature of records, then kept and preserved, by proof of subscription and payment, or otherwise.

The term " said congregation" is a good *designatio persona-rum,* connected, as it is, with the introductory part of the indenture, describing them as the congregation belonging to the Presbyterian Meeting-house in Long Lane, and with the general tenor and effect of the indenture. By the award, it was directed that the conveyance be made to the congregation; and the fair presumption is that when they came to be advised by the conveyancer that such a deed would not be valid in that form, that was done which all parties deemed equivalent—a deed was made to some of them personally, being the prudential committee, to the use of the whole.

The establishment of companies to hold real estate, for purposes not religious, where the legal estate is vested in a corporation or trustees, but the whole beneficial estate is vested in others, is a well known form of taking a title to property. In all cases of moneyed corporations, for manufacturing, banking and other purposes, the whole legal estate is in that creature of law called a corporation, but the whole beneficial interest in members or stockholders. So when companies have been formed without incorporation, consisting of considerable numbers, for the purchase of wild lands, with a view to a resale or other like purpose, the grant is made to trustees in trust for several members designated, and a certificate of such right to an aliquot part

of the beneficial interest is usually issued by the trustees to the several parties, indicating what aliquot part each holds in such trust property or beneficial interest; and such certificates are well understood as muniments of property.

We consider the case of a grant to a corporation or to trustees, for the uses of a religious society, analogous in this; that whilst the whole legal estate is in the trustees, the whole beneficial interest is in the members. This is usually, and may, by proper terms of agreement amongst the associates, be exclusively manifested by deeds of pews, so that the whole beneficial interest is in the pewholders. Or, as the holding a title to a pew is conclusive evidence that the holder has a share in the beneficial interest in the estate held by trustees for the use of the congregation, and these shares may include the whole interest, and after a lapse of time no other person can produce evidence of having any such beneficial interest, the trust will be held exclusively for the congregation composed of pewholders and their families, not because, by any general law or ecclesiastical arrangement, pewholders have a right to control the use of the meeting-house, but because, in the particular case, the property was conveyed in trust for the associate body who formed the congregation. The pewholders in such case show their title to a share in the beneficial interest by their deeds, no other person exhibits any such proof, and therefore the pewholders are the only beneficiaries.

Indeed, in later times, especially in Boston, most of the acts of incorporation of religious societies have in terms incorporated the proprietors of pews, which is a convenient and sufficiently certain designation of the persons to be incorporated and to hold as members. All the cases hereinbefore cited and many others are of this character. The effect of this is to make all those who are holders of pews, for the time being, members, so that when they become holders of pews they become corporators, and when they cease to hold pews they cease to be corporators. It may be proper to add here that it is competent for such a society to make such reasonable by-laws and regulations, respecting the sale and purchase of pews, as they think their interests as a re-

ligious society may require. And it is usual for such societies to make such regulations in regard to the sale of their pews, and express them in the deeds they issue, as to prevent an indiscriminate sale of pews, and thus retain some right to elect and determine whom they will associate with, or rather who may associate with them. Otherwise, if it were free to anybody to purchase pews without restraint, a number of people of another denomination, finding pews low, might purchase them and become a majority, and thus turn the proper congregation out of their own house.

One other remark it is necessary to make respecting the character of this conveyance. It will be perceived that, in the conveying part of it, the grant is to Glen, Hall, Shaw and Knox, omitting the words " heirs and assigns," and in the habendum it is to them " in their capacity aforesaid, and to their successors in that trust and office forever." Here, by the strictest construction of law, though the property could not go in succession, and the limitation to successors were void, yet the grant to the four individuals named would be a good conveyance to them for their lives. Then we are to apply the well established rule of law, that when an estate is granted to one or more, without words of limitation to heirs and assigns, in trust, and the trust is of such a nature that to support and carry it into effect requires a legal estate in the trustee for a duration which will or by possibility may exceed the life or lives of the trustee or trustees, the law will construe the estate to be a fee. *Cleveland* v. *Hallett,* 6 Cush. 406. Here the trust was to continue indefinitely ; it might be long beyond the lives of all the trustees. It was therefore a conveyance in fee, and no reversion or other *scintilla* of legal interest remained in the grantor. It was a conveyance in fee to Glen and others, in trust for the use of that congregation.

The court are unable to perceive in this transaction any of the characteristics of a charitable foundation, to be vindicated by the public, through the attorney general, on the ground that those who ought to reap the benefit of it are incapable of vindicating their own rights.

In the first place, it is entirely wanting in the quality of gift, donation or gratuity, from anybody to anybody. Deering was paid a full consideration for the land by Little. Little was paid a full consideration for the land and building and all incidental expenses, including his own services " with respect to his attendance upon and looking after the building of the said meeting-house." It was not a purchase by the grantees, and a donation from them to the congregation; for they acted in a representative capacity for themselves and the congregation. Besides, the award was to make a deed to the congregation, thereby showing that the whole consideration moved from them; and the probability is, that, in proceeding to carry that award into effect by a conveyance, they were informed that a deed in those terms would not be good, because they were not a corporation; but a deed to some, in trust for the congregation, would accomplish the same thing in legal effect, and be a substantial performance of the award.

Nor can we perceive any uncertainty in the persons who took an equitable interest in this grant; they were persons capable of asserting and vindicating their own equitable rights in a judicial tribunal. Even if it constituted a dedication to a special Presbyterian religious use, as amongst themselves, so that each one should be bound to all the rest, and all to each one, that it should not be diverted from such religious use, a trust of which we say nothing at present, it would not constitute a charity; because it is quite definite and certain who were the persons beneficially interested in such use; and they, and they only, could claim its execution in a court of justice or elsewhere.

And we do not perceive in it any public, general or indefinite object, such as preaching the gospel, or any particular form of the gospel, to the poor generally, or to any particular class of poor, or to any persons gratuitously who might, at any future time, choose to attend on such ministrations at that place. No such design or purpose is stated or intimated. On the contrary, it was to constitute a religious society, for the use of the members and proprietors who might be pewholders, or of them with other members, according to circumstances.

But it was urged in argument that it is usual in all Christian societies and places of public worship, that all persons who choose may in fact attend, and that it is usual to set apart free seats, and so the public are benefited. The fact is undoubtedly so, that persons who desire it may usually attend; but it is matter of courtesy, and not of right. On the contrary, any religious society, unless formed under some unusual terms, may withhold this courtesy, and close their doors, or admit whom they please only ; and circumstances may be easily imagined in which it would be necessary to their peace and order that they should exercise such right. Were it otherwise, and were the occasional permission of all persons to enter churches, and listen to preachers, to be regarded as a public or general right, every parish, territorial or poll, every society formed by the incorporation of proprietors or pewholders, must be considered as a public charitable institution, to be regulated and controlled by an information filed by the attorney general at the relation of any person desirous of attending the religious services of such societies.

But a public charity, in legal contemplation, is derived from gift or bounty. ` *Attorney General* v. *Hewer*, 2 Vern. 387. In the case of *Attorney General* v. *Heelis*, 2 Sim. & Stu. 77, it is said by the vice-chancellor that it is the source whence the funds are derived, and not the purpose to which they are dedicated, which constitutes the use charitable ; if derived from the gift of the crown, or of the legislature, or a private gift for improving a town, they are charitable, within the equity of the *St.* of 43 Eliz. *c.* 4 ; but where a fund is derived from rates and assessments, being in no respect derived from bounty or charity, it is not charitable. So a subscription by a benefit society, for mutual relief, is to a private, and not a public charity, and does not require the intervention of the attorney general. *Anon.* 3 Atk. 277.

It may be of use to look at the information, and see how the attorney general has stated this, as a public charity, without which he with his relators have no standing in court ; and see how far the averments are proved. After stating the conveyance from Deering to Little, and the consideration, it proceeds to state that the said John Little, being minded and disposed t .

devote his property to the founding and supporting of a church and place of religious worship, to be held and enjoyed forever for the preaching and maintaining the doctrine, discipline, worship and form of government of the Church of Scotland, did make the deed in question, with the habendum as before stated, and refers to the deed. This averment, so far as the question is of its being a charitable gift and foundation, or any gift or donation whatever, in the sense of being voluntary or gratuitous, which is the foundation of this claim, we think is not sustained by the proof.

It then alleges that Little, and Glen, Hall, Shaw and Knox, with others, being Presbyterians, being minded and disposed to devote *their property* to the founding and supporting of such a church, and to create and found a trust and charity therefor, did severally contribute, Little the land, and the others moneys wherewith the meeting-house was built, and did thereafter, by said indenture, create and establish the said trust and charity. This refers to the indenture which we have before us, and on the true construction of which, these averments, as legal inferences from the indenture made, under the circumstances stated, by Little, and accepted by Glen and others, must depend.

We think this indenture, and the award referred to in it, wholly fail to show that Little had any purpose to make a donation of his property, but the contrary. The indenture also fails to show that Glen and others, the grantees, intended to give, or did give their property to any purpose of charity. They took no interest in the estate, except by the force and operation of the indenture; and that is the conveyance of a legal estate, upon a pure, naked trust for others, without any beneficial interest in themselves, except such as they might have in another capacity, as members of the congregation. The same instrument which vested the legal estate in them declared the entire beneficial use for others, and thus divested them *eo instanti* of all pecuniary, beneficial or available interest, out of which any gratuitous valuable donation could be made. Nor is there any evidence in the indenture, or the attending circumstances, to show that they did accept the grant to hold for any public, indefinite

or general use; but, on the contrary, they accepted it for the use of all the proprietors as members of said congregation, being pewholders, and perhaps others, ard those who should succeed them in the same relation. And whether that purpose was accompanied with another, that it should be held exclusively for Presbyterian worship and discipline, is immaterial to the question whether they founded a charitable donation.

The next paragraph in the information reiterates the averment, that by the said deed, the said Little, Glen and others created a trust or charitable estate of a very high character, to wit, for the support of the Christian religion according to a certain form of worship. No new fact is stated, this paragraph refers for authority to the deed alone; calling it a charitable estate does not make it so; and we have already stated that by the deed, though there might be a trust, there was no charity established.

Having come to the conclusion that this suit, as an information in equity, to establish, declare or regulate a public charity cannot be maintained, perhaps it might be better to stop here. But as it has been insisted in the argument that the complaint by which this suit was commenced may be regarded as a bill in equity, to investigate and enforce the rights of parties aggrieved by a breach of the trust set forth, as well as an information in equity in behalf of the public, though upon reading the complaint we should have hardly considered it as being of that character; and as there are precedents, we believe, for thus combining, in one prosecution, the vindication of private together with public rights; it may not be considered inappropriate to consider briefly some of the other questions discussed in the argument, and which would naturally arise in that aspect of the case.

The supposed trust, for maintaining in said religious society the doctrine, faith, discipline and mode of worship of the Presbyterian Church exclusively, is found in the clause in the deed from Little to Glen and others, contained in a parenthesis in the habendum, after the words " to the only proper use of said congregation, (according to the tenures and after the same manner

as the Church of Scotland hold and enjoy the lands whereon the meeting-houses are erected.)

In terms, this applies to the tenure or mode of holding the land. It is a little doubtful whether in this clause the parties intended the Church of Scotland, spoken of as a whole, or the parish churches of Scotland as separate societies. But whether the one or the other, it would be impossible for these trustees, or any trustees in Massachusetts, so to hold this estate.

It appears, by the evidence, that before the Reformation, the whole territory of Scotland was divided into parishes; and since the firm establishment of the Presbyterian Church, as the established religion of Scotland, a lot of land is set apart in each parish for a church edifice, and probably for a manse or parsonage house, and other parish purposes, and this land is specially and inalienably appropriated by law to the support of public worship, conformably to the faith, discipline and practice of the Presbyterian church. It also appears that by law the heritors or landholders, in each parish, are bound to pay for the erection and repairs of churches. The land therefore could not be held here, as it was held in Scotland, for parish purposes. But suppose we look beyond the letter, to the real purposes of this body of Christians, what were they? Whatever might be their desire to bring themselves under the power and protection of the church of Scotland, it was impossible, because it appears that the church of Scotland never did, as a hierarchy or ecclesiastical judicatory, take any jurisdiction of the Presbyterian churches of this country. Supposing their wish was, to approach as nearly as practicable to that condition, and for that purpose to place themselves under the protection and jurisdiction of some presbytery in this country; a difficulty would still meet them. By the established hierarchy of Scotland, each parish has its kirk session, of teacher and elders; a number of parishes together form a presbytery of the bounds, having jurisdiction over all the parishes within those bounds; and several presbyteries form a synod; and over the whole church is a general assembly, formed by delegates from all the synods. Each inferior judicatory is subordinate to the next superior. This jurisdiction in all matters of spiritual or

ecclesiastical concern is authoritative and fixed by law, and no parish or church can avoid it. If therefore any number of parishioners, or even nearly the whole, become heretical in faith, or irregular in practice, they may be excommunicated, and then they can have no share in parish privileges, or voice in parish concerns. If they secede, they may be removed, and the property will be taken possession of by the presbytery of the bounds, to be retained until another orderly congregation can be formed within the parish. For though the presbytery will exercise only a spiritual jurisdiction, yet as the right of any parishioner, or any number of parishioners, depends on their being in regular standing with the church, as soon as they are removed by the ecclesiastical authority, they lose all benefit of the property appropriated by law to the support of the established church. Nothing similar could take place in this country.

But to take the most liberal view of the matter, and suppose they intended to establish a religious society, conformable in point of religious belief, doctrine and discipline, to the usages of the Church of Scotland, as nearly as circumstances would permit; as there could be no presbytery of the bounds to exercise authority over them, they must of course connect themselves, by their own voluntary act, with some presbytery, synod, or Presbyterian jurisdiction; and as such submission would be purely voluntary on their part, it is difficult to say that they could not withdraw and unite themselves with some other presbytery, or become independent, when, as a body, they should think fit so to do.

But it was maintained that, although there could be little or no analogy between a Presbyterian church thus formed under trustees in this country, and the regular parish churches of Scotland, where the lands are allodial and not held by trustees, yet that there is a strong analogy between the society established under trustees in Long Lane, and the chapels or meeting-houses established in large parishes, where the parishioners become too numerous to be accommodated at the parish church, and where land is purchased and vested in trustees, to form a religious society in connection with the church of Scotland.

There is certainly a considerable outward analogy between the society in Long Lane, and these chapels, which may for convenience be called chapels of ease, the land being vested in trustees, in trust for a religious society in connection with the established church, a very interesting account of which is given by the learned advocate, John Shank More, Esq., who has been examined as a witness in this case. It seems that the deed we have been examining had been submitted to him; and he describes these chapels or meeting-houses, which have been erected in connection with the Church of Scotland, and which are held under trusts similar to the trust created by this deed. He states that these chapels are usually held under trust, and they are either expressly or by inference declared to be held for the use of a congregation in connection with the Church of Scotland. And it has been decided in regard to chapels or meeting-houses held under such trusts, that the presbytery of the bounds may, in the event of any violation of the trust, reclaim the land and the meeting-house itself, and may insist on its being devoted exclusively to the use of a congregation in communion with the Church of Scotland, as by law established. This holds, not merely where the congregation have become independents, and repudiate the Presbyterian polity, but also where they retain the Presbyterian polity, if they do not retain their connection with the established church. That is, this rule extends to seceders from the existing established church, although adhering in all respects to the faith, doctrine and discipline. For this he cites the following decisions by Scottish civil tribunals: *Presbytery of Edinburg* v. *Trustees of Lady Glenorchy's Chapel*, 18 Jurist, 305; *Presbytery of Fordyce* v. *Shanks*, 11 Scotch Court of Sessions Cases, (2d series.) 1361; *Bain* v. *Black*, 11 Scotch Court of Sessions Cases, (2d series,) 1286, and 6 Bell, 317. He adds, that in case of any change of doctrine or discipline, of becoming Unitarian, or Congregational, the church would forfeit all right to the enjoyment of the meeting-house; and the presbytery of the bounds, as representing the Church of Scotland, would be entitled to claim the chapel, and to insist that it should be exclusively occupied for the use of a congregation in connection with the established

church. This view is substantially confirmed by the testimony of another learned advocate, Alexander Shank Cook, Esq. Both of them distinctly state that these results flow from the existing law of the land. It is confirmed also by Dr. Hill. A circumstance is stated in the testimony of Dr. Forsyth, which tends to explain this matter, which is, that such chapels in aid ᴏf the regular parish meeting-houses were usually built by conꜩᴉʙᴜtion; but they could not be established without a special authority from the General Assembly, called a "constitution;" and whatever other provisions were made by such constitution, in favor of pewholders or other members, it was the invariable practice to insert a clause that the chapel should be held to the use of a congregation in connection with the established church.

The constitution of these chapels certainly very much resembles in form and tenure that of the Presbyterian Society in Long Lane in Boston. The first remark to be made is that these special Presbyterian churches were not introduced till about 1750, and could not have been regarded as a model by the society in Boston in 1735. But supposing this to be similar to those formed later in Scotland, and supposing it be asked why, according to the testimony, upon this church becoming Congregational in 1786, or Unitarian afterwards, they did not forfeit all right to the property, and why did it not become vested in some presbytery, for the use of the Presbyterian Church? The answer we think simply is, that the law of Scotland and the law of Massachusetts, when this conveyance was made and when this meeting-house was built, and thence to the present time, have been wholly different. In Scotland, the Presbyterian religion was established by law. The whole territory was divided into parishes and presbyteries, by territorial limits. Every meeting-house which could be built must be within the limits of some territory over which there was a controlling power entirely paramount to that of the congregation or trustees. One of these chapels could not be constituted without being expressly devoted to the use of the Presbyterian Church; because, if otherwise constituted, they would be mere dissenters, and not recognized in any respect as Presbyterian. Then, by force cf law, if any

one of these congregations changed its doctrine or form of worship, here was a power—not merely a spiritual or ecclesiastical power, but a civil power—exerting the acknowledged and irresistible law of the land, legally authorized to remove them and hold the property until a Presbyterian congregation should be formed in its place.

In Massachusetts no such law existed. On the contrary, every religious society, unless restrained by some special trust, by the general law were at liberty to change their denomination, to profess and peaceably to inculcate any Christian faith or doctrine, and adopt the form of worship most agreeable to themselves ; and, by doing so, no forfeiture could be incurred. There was no presbytery of the bounds, to declare any forfeiture, or take possession of the chapel or other estate of any such seceding church. If a religious society, attached to the tenets and practices of the Presbyterian Church, chose to attach themselves to any Presbyterian community, it was their voluntary act; it was for spiritual edification and assistance only ; and any superior ecclesiastical judicatory, presbytery, synod or general assembly could act only by spiritual censures, and had no jurisdiction over their temporalities.

From the evidence of the learned Scottish jurists, who have aided us with their testimony, we think it highly probable that, if asked, they would have expressed the opinion that, if a conveyance like that from Little to Glen and others had been made in Scotland, and afterwards the congregation had become Unitarian or otherwise congregational, the estate would have been forfeited, and might be claimed and held by the presbytery of the bounds. And for myself, I have no hesitation in saying that I should concur with them in that opinion. But it would be so entirely by force of the law of the land, not merely of ecclesiastical regulations and usages, but by the municipal law, recognized and enforced by the civil tribunals. But as no such law does exist, or has existed, in this state, it is manifest that these rules can have no bearing on the present case.

We would not be understood to express an opinion that, under our law, an owner of property may not dispose of it upon special

trust to maintain and inculcate any doctrines of Christianity clearly and specially designated, or to carry on any form of Christian worship specially and intelligibly described and speci-fied; because an owner of property, with a general power of disposing of that property, may devote it to any purpose not unlawful; and if so, he may do it in the form of a trust. It is one of the incidents to the right of property. But he must do it in terms so clear as to leave no doubt of his intentions. A court of equity, under its general power and duty to see that trusts are not perverted, and upon the application of proper par-ties, and upon proper issues, may be obliged to inquire into the fact whether such doctrines have been professed and promul-gated, such forms of worship adopted or rejected; not to decide whether such doctrines are sound, but whether the trustee has conscientiously done that without which he has no good right to hold the property, or to use it as he has done. Such we take to be the case of Lady Hewley's Charity, *Shore* v. *Wilson*, 9 Cl. & Fin. 355, and many other cases cited in the argument, decided in England and in this country. These cases have no direct bearing upon the question, and we have alluded to them only for the purpose of avoiding any wrong construction which might arise from our view of the Scotch cases, and the whole of the evidence upon the subject.

Supposing then the whole practice and usage of Scotland, in 1735 and since, both in regard to parish churches and to chapels or meeting-houses, established by contributions from individuals, in connection with the established church, and the property vested in trustees, to be inapplicable, because they depended upon the law of Scotland, and because there was no presbytery of the bounds within which Boston was situated which was authorized or capable of exercising a paramount jurisdiction, or taking any jurisdiction of the Presbyterian Church in Boston, the nearest approach they could make to the establishment of a religious society of a Presbyterian character would seem to be to call and settle a minister professing the faith and desirous of maintaining the order and discipline of that church, by volunta-rily associating themselves with other similar societies, and thus

forming a presbytery, to whose jurisdiction, in matters of spirit-
ual concern, they would submit themselves, according to the
forms of proceeding in the Church of Scotland. We say the
forms, because no presbytery which they could thus voluntarily
form could exercise a permanent authority in temporal concerns,
for want of the law of the land to establish it. It appears, from
the imperfect records produced, that the society, by their minister,
Mr. Morehead, did unite themselves with the Presbytery of Lon-
donderry; but after his death, in 1773, they declined the juris-
diction, and that act was afterwards, by another presbytery to
whom they applied, pronounced to be regular and valid. From
this it seems manifest that there was no superior ecclesiastical
judicatory, having the right and power to coerce, restrain, direct
or regulate the conduct of this society, even in spiritual and ec-
clesiastical concerns, any longer than it was their will to submit
themselves to the jurisdiction of such superior. But without
tracing their changes, or inquiring whether all or either of the
ecclesiastical bodies with whom, at different times, they volunta-
rily associated, conformed truly to the doctrine, discipline and
form of worship and church government of the Church of Scot-
land, during the twelve or thirteen years which elapsed between
the time of Mr. Morehead's decease and the vote of 1786, we
are brought to consider the fact and the effect of the proceedings
of that date.

It appears that Rev. Mr. Robert Annan, the last Presbyterian
minister, received a call to a parish in New York, which was
communicated to the presbytery in February 1786 ; and notice
being ordered to the society in Boston to show cause, they made
no appearance, and no doubt the call was allowed and accepted.
In August following, at a meeting of the proprietors and others
of the Presbyterian Church in Long Lane, it was " voted, unani-
mously, that the church and congregation do embrace the Con-
gregational mode of government, and that all difficulties in the
church hereafter be settled by the ministers or male members of
the church." It further appears, that they not only voted to re-
nounce Presbyterianism and become Congregational, but they
acted accordingly, and soon after settled Dr. Belknap, and have

ever since acted as a Congregational church and society; and that in 1805 an act of the legislature was passed, ( *St.* 1805, *c.* 19,) entitled, " An act declaring and confirming the incorporation of the Proprietors of the Meeting-house in Federal Street, in the town of Boston," thereby implying the existence of a previous act, though none appears. It was decided in the early part of the present century that an incorporation of a town or parish might be presumed from length of time, and the actual long and uninterrupted use of corporate powers. *Dillingham* v. *Snow,* 5 Mass. 552. The act then proceeds to incorporate " all persons who now are or who may hereafter be proprietors of the pews in the Congregational Meeting-house in Federal Street," and they are declared and confirmed to be a corporation by the name of " The Proprietors of the Meeting-house in Federal Street in the town of Boston."

Now in regard to the vote of 1786, supposing this society, so constituted a religious society under the deed of Little to Glen and others, by a mutual agreement and compact in the nature of a mutual trust, all for each and each for all, to maintain public worship according to the faith and creed, form and worship, and as nearly as practically they could, to the discipline and form of government of the Church of Scotland, we are strongly inclined to the opinion that, by the unanimous consent of all legally and beneficially interested, they could change or wholly relinquish such trust. It is to be considered that the trustees were also *cestuis que trust;* that their rights, as also the pews of all the pewholders, were descendible and transmissible to heirs; that the pewholders were certainly *cestuis que trust* beneficially interested; and there is no evidence that any other person than pew-holders had any interest, legal or equitable, in the estate. The record shows that the vote was unanimous; and there is no evidence to control it, or raise a doubt of its truth. It is alleged in the information, but denied in the answer, that there was a minority who opposed this change, but that they were overborne by a majority. As no evidence was offered to prove this averment, the answer is conclusive, and the fact is not proved.

Supposing then a trust created for a religious use, for persons

specially designated, for their own use, not general and indeterminate so as to constitute a charity ; and all persons interested, trustees and *cestuis que trust,* change their religious views, become sincerely converted to another mode of christian faith, and desire another form of worship ; why should they not make the change ? The trust is created, if at all, out of the right of property; the change is desired and effected by all those who have any interest legal or equitable in that property. Who is there to object ? Whose rights are impaired ? It is contrary to no law ; all sects and denominations are equal before the law ; it opposes no public policy ; on the contrary, it is an advancement of the policy declared by the Constitution, in the third article of the Declaration of Rights. In this respect, a religious society, thus constituted by making some trustees to hold the legal estate, but for the use of themselves and others designated, is very similar to a poll parish incorporated by statute, or under the religious freedom acts ; and though they be of one denomination, when incorporated, we are aware of no rule of law, or principle of equity, which prevents them from changing their creed and modifying their practice, as their own consciences and views of propriety may dictate. We think the same rule applies in the present case, wnere the vote was unanimous. What would be the effect in this respect if one or more had opposed, we have no occasion to consider.

We have said that, in the case supposed, we are inclined to the opinion that the change of denomination would be justifiable, and put an end to the trust. We do not state it more strongly, because perhaps there were persons interested, not present at the meeting and not notified, but more particularly because we do not place our judgment on that ground. But it leads to another consideration, which we consider more decisive, and that is the law of limitations.

It has sometimes been said that the statutes of limitation do not extend *proprio vigore* to suits in equity in England, although it is everywhere conceded that the principle is adopted. It is thus stated : Though the statute bars only legal remedies, yet courts of equity, by their own rules, independently of any statutes

of limitation, give great effect to length of time. But in the same case a court of equity, in deciding on the effect of a statute of limitations of Jamaica, which, in the nature of presumption, went to quiet the title, after an adverse possession and the lapse of seven years, held that the statute was as binding on a court of equity as a court of law. *Beckford* v. *Wade*, 17 Ves. 87.

And in this state it has been decided that the statute of limitations, barring suits after a certain time, extends as well to equity suits, as to suits at law, as a proper bar. *Farnam* v. *Brooks*, 9 Pick. 212. *Baker* v. *Atlas Bank*, 9 Met. 182. In the first of these cases, the court say, in the opinion expressed by Parker, C. J., that in this court as much force must be given to the statute, when pleaded to a bill in equity, as to an action at common law, and it can be avoided in the same way only, that is by proof of fraudulent concealment and a discovery of the fraud, within the time of limitation. And he cites a great number of authorities, English and American, to support this decision.

It is true, that in a direct question between trustees and *cestuis que trust*, the possession of the latter is the possession of the trustees, and cannot be adverse. But when another party, not acknowledging the trust, but denying that any such trust affecting the estate has been created, or asserting that it has been fully performed, or released or discharged, or otherwise does not exist, and claiming adversely both to trustee and *cestuis que trust*, such a possession is adverse; and if all those who would have a right to question it, lie by and acquiesce, during the time of limitation, the statute is a bar.

In the present case, we are inclined to the opinion that the possession became adverse, by the vote of 1786, and the holding under it. They were in possession and had the right of possession, whether in trust or not is the question. They declared publicly by their acts and votes, that under a claim of right to do so, they held it for a purpose inconsistent with a presbyterian use exclusively, that if any such trust ever had existed, it had ceased to exist, and they denied and repudiated it. It is not now the question, whether they have a right to do so, and whether their possession was lawful, but whether it was adverse.

If it was, then all those who had any claims legal or equitable, including all synods and Presbyterian bodies, with whom they had at any time been associated, were bound to come forward and assert their rights; otherwise, their consent was to be presumed. We believe the statute of limitations was not then in force; but the rule of twenty years' acquiescence in similar cases was held equivalent. That vote was passed nearly seventy years ago.

But whether that vote and the acts and possession under it are to operate as a bar or not, we are of opinion that the act declaring and confirming the incorporation of the proprietors of pews in the Congregational meeting-house, together with the acceptance of the same and acts of the parties under it, continued during the period of limitation, is such bar. The act declares that the corporation shall be deemed in law seized of the meeting-house and lands, including the dwelling-house then recently erected on the land appurtenant for the accommodation of the minister of that society, reserving to the several proprietors of the pews their right to and interest in the said pews respectively. This created the tenure, like those, heretofore described, by which the lands were held on which other meeting-houses in Massachusetts have been built and maintained, vesting an estate in the house and land in the corporation itself, with an estate in the holders of pews, peculiar, subordinate and derivative, still an estate and property recognized and protected by law. This, we add in passing, ascertains and identifies the rights of pewholders in Massachusetts so definitely, as to render the evidence offered in this case, respecting the rights of pewholders, both in parish churches, and separate chapels, in Scotland; and in those of Canada, and the other states of the Union, of little importance, as evidence of the rights of holders of pews in Massachusetts. The same remark may be repeated here, which has been before made, that it is not the name or fact alone which decides the rights of the parties, but the facts existing in connection with the governing law of the place, giving their whole significance, and on which the legal and equitable rights of parties depend and must be determined. There are

no doubt persons holding pews or separate seats, in the parish churches and Presbyterian chapels in Scotland, in Episcopal churches and dissenting meeting-houses in England, and perhaps in similar churches and chapels in Canada, and in the other states, all of whom hold a relation to their churches and places of worship, similar in fact, in many respects, to that of pew-holders in Massachusetts; but the measure, the extent and limitations of their rights, incident to such relation, must depend on the laws acknowledged and enforced in these respective places; and these laws are so various, that no just inference can be drawn from the rights of the one to those of the other.

The act declaring and confirming the incorporation of those " who now are, or who may hereafter be the proprietors of the pews in the Congregational meeting-house in Federal Street, in the town of Boston," was passed in June, 1805; the proprietors were afterwards in the actual and exclusive possession till some time after 1846, when a demand was made upon them by the relators, who formed a Presbyterian society in Boston in that year. Regarding the question as affecting the realty, these acts would seem to constitute a seizin either by right or by wrong, and of course a disseizin of trustees and *cestuis que trust,* claiming to hold for a different purpose, and against whom such entry and holding by the respondent society must be deemed adverse; and after the lapse of twenty years, or perhaps, as the law then stood, thirty years, from the time of such acts, all right of entry and of action would be barred.   In fact, the act itself implies that they had been long in possession before its date; and more than forty years elapsed, after its passage, before their right was questioned. If this would have been a good bar at law, on a question of title in a real action, *a fortiori* must it be regarded, as a long continued adverse possession, sufficient to preclude all claim in equity.

The conclusions, then, to which the court have come are these: That by the transactions of 1730 and 1735, between Little, Glen and their associates, and the deed from Little to Glen and others, they did not intend to form, and did not in fact form or found any public charity or any charitable founda-

tion whatever; that it was their intention to establish, and they did establish a parish and religious society, for themselves and their families, their associates, successors and assigns, and had full right and lawful authority under the laws of Massachusetts, to adopt such Christian doctrines, form of worship and church discipline, as were consistent with the dictates of their own consciences, and sense of duty and propriety, and to alter and change the same from time to time; that the whole property and interest in the land, church edifice and buildings, remained in the trustees and associates, who, by their united and continued will and action, might control and dispose of them; that they manifested a desire to organize themselves into a religious society in conformity, as nearly as practicable, with the doctrines, discipline and practice of the Church of Scotland or Presbyterian Church; that if this manifested a preference of that form of worship, and a mutual agreement amongst themselves, in the nature of a trust to and for each other, still it was one, which by mutual consent, and especially by unanimous consent, they could alter and change for their own benefit; that, by the unanimous vote of the proprietors in 1786, they did alter and change it by the consent of all parties interested in the preservation of that trust, by which it was terminated and discharged; that if the deed from Little to Glen and others vested the legal estate in them, as trustees, in fee, such estate descended to their heirs, and is now outstanding in such heirs, and were it now a question of legal title, between such heirs and the respondent society, the facts that the respondents were in possession in 1805 claiming title, that the act then passed declared them seized in fee of the estate as a corporation, their acceptance of the act, and holding under the same peaceably and adversely more than forty years, would be a disseizin of the trustees, and bar of their legal title; and as the respondent society claimed to hold adversely as well to the *cestuis que trust*, as to the trustees, such possession for such length of time is a bar alike to all legal and equitable claims to the estate in controversy.

*Decree accordingly.*